120 A.2d 311 (1956)
Harry FRANKEL, Plaintiff,
v.
G. E. DONOVAN, A. F. Chrystal, D. B. Geddes, S. L. Barbera, B. G. Furey, W. F. Mohan, M. Pretz, G. R. Aitken, S. D. Brown, T. G. Burke, R. Clifford, L. G. Farrell, H. R. Glennon, Jr., G. S. Kuykendall, H. S. Mayo, J. A. Medernach, J. F. Sand, Edgar Svikis, A. C. Visceglia, G. L. Holt, W. T. Moore, K. C. Tripp, W. H. Leith, S. J. Mueller, J. S. Harris, Katherine R. Swanton, Executrix of the Estate of Gerald F. Swanton, E. G. Barrett, Walter W. Dunker, C. F. Hodder, M. J. Kelly, Harry Martin, H. F. Sheeley, B. Silf Verberg, E. F. Sweeney, W. Bachmann, J. D. Beatty, J. G. Capelli, A. J. Corbett, Albert A. Cuneo, D. H. Downes, F. B. Fitch, H. K. Grady, C. A. Gutierrez, T. H. Kane, A. J. Keenan, R. A. Molloy, R. E. O'Brien, J. F. Roche, A. P. Smith, and Moore-McCormack Lines, Inc., a Delaware corporation, Defendants.
Court of Chancery of Delaware, New Castle.
February 10, 1956.
*312 William E. Taylor, Jr., and the late Robert C. Barab, Wilmington, and William E. Haudek (of Pomerantz, Levy & Haudek), New York City, for plaintiff.
Richard F. Corroon (of Berl, Potter & Anderson), Wilmington, for defendants.
MARVEL, Vice Chancellor.
Plaintiff, a stockholder of the corporate defendant suing in a representative capacity for all stockholders, complains that stock options granted in 1951 and 1952 by the corporate defendant to fifty of its executive employees under restricted stock option plans adopted by directors subject to approval by the stockholders,[1] were invalid when issued because said options were allegedly gifts,[2] having been granted without consideration. The forty nine individual defendants have either exercised or hold exercisable options, the options of one deceased officer having lapsed unexercised.
In March 1951, at a meeting at which a quorum of four directors of Moore-McCormack Lines, Inc.,[3] was present, it was resolved subject to stockholder approval to adopt a restricted stock option plan for twenty five key employees. Two of the four directors adopting this first plan were to be optionees, but a disinterested board meeting later in the month ratified the adoption of the plan. In April at the annual meeting of stockholders the plan was approved by the holders of 856,849 shares of stock out of 1,524,306 shares outstanding. The option price for stock issued under the agreements as adjusted by reason of a stock dividend of November 1, 1951, was fixed at $12.40 per share and the aggregate number of shares covered by the options totalled 74,375. Following stockholder approval, option agreements were entered into by those employees who had been made eligible for option grants by a disinterested committee. These agreements stated that:
"* * * the purpose of the restricted stock option plan is to advance the *313 interests of the Corporation by providing an incentive to participating key executive employees in the form of an opportunity to acquire a greater proprietary interest in the Corporation and thus stimulate their efforts in the corporate welfare * * * this restricted stock option plan is projected pursuant to and complies with Section 218 of the Revenue Act of 1950 [26 U.S.C.A. (I. R.C.1939) § 130A], and, in the words of the Congressional Committee, has for its purpose the idea of `converting officers into "partners" by giving them a stake in the business, to retain the services of executives who might otherwise leave, and to give key employees generally a more direct interest in the success of the Corporation.'"
Substantially the same language was contained in a description of the plan prepared for stockholder information prior to the annual meeting. The options were to be effective for five years and were "* * * exercisable in one or more full shares from time to time from the date * * *" of issuance * * * "to the expiration date * * *" The options provided for their termination three months after a holder ceased to be employed by the corporation and also permitted their exercise during a six month period following an option holder's death by the representatives of the estate of an optionee in the absence of testamentary disposition. The options were non-transferable and each option holder entering into an agreement represented that he had exercised the option for "* * * investment only and not for distribution."
A year later a similar option plan was adopted for an additional twenty five employees at a board meeting at which three of the seven directors present and voting were optionees under the first plan. None of the directors at this March 1952 board meeting was an optionee under the new plan. The second plan was duly approved by the vote of 1,106,928 shares of stock out of 1,913,264 shares outstanding. The 1952 option agreements were made effective for a period of five years and the option price was fixed at $16.33 per share. The number of shares covered by the options to be granted under this plan totalled 20,110. The origin of the second option plan, the agreements thereunder and the facts furnished to stockholders about the purpose of the plan were in all respects similar to the corresponding elements of the 1951 plan. Some 29,000 options were exercised under both plans prior to April 28, 1955, at times when the market price of the stock was higher than the option price.
There is no doubt but that the option plans under attack were adopted to inspire greater effort and loyalty on the part of the option holders. It is also obvious as has been the case in other option plans attacked in this Court that the genesis of the plan was closely associated with enactment into law of the provisions of the Internal Revenue Act of 1950 dealing with stock options. All of the option holders were employed by the corporate defendant at the times the plans were adopted and most of them were employees of long standing. None had actually threatened to leave the employ of the corporate defendant unless options were granted despite the fact that from 1937 until 1952,[4] $25,000 per annum was the top salary legally permitted to be paid by the corporate defendant to its employees.
Plaintiff contends that because options made available under both plans were exercisable as soon as they were granted and because those who received options made no covenant to render services in return, the options were conferred without *314 consideration and were in effect an unauthorized gift of corporate assets. If the options were a gift of corporate assets, the option plans must give way to stockholder attack, Kerbs v. California Eastern Airways, Del., 90 A.2d 652, 34 A.L.R.2d 839. In the cited case the Supreme Court decided that the option plan there under attack was defective because the plan itself as well as the facts and circumstances surrounding the plan were not reasonably calculated to insure that the consideration moving to the corporation in the form of services would in fact be received.
There can be no doubt but that the[5] real consideration moving to the corporation as a result of the grant of the options was the return to be derived from increased job satisfaction inasmuch as the plan offered each optionee the opportunity of acquiring and nurturing an owner's interest in a business, the salary ceiling of which was fixed at an unrealistic level by an obsolete federal law. This is true even though it is found as a fact that none of the individual party defendants to this suit entered the employ of Moore-McCormack or refrained from leaving the corporation's employ because of any express promise concerning stock options. Our Courts have held, however, that legal consideration sufficient to support an option plan is not found in increased employee effort and loyalty attributable to job satisfaction or in the incentive which an option plan furnishes to stay with one's old job. There must be in addition some assurance in an option plan or in the circumstances surrounding it that an ungrateful employee won't take his options and leave prior to rendering services reasonably expected by the corporation in return for the grant.
In the Kerbs case the Supreme Court stated that it did not think that an employment contract was the only way of making reasonably sure that a corporation would receive the services for which it had bargained in offering options under a plan, nonetheless it is the type of covenant normally employed to insure the receipt of contemplated benefits in the absence of conditions in the plan itself for the withholding of options until some services have been performed. Compare Gottlieb v. Heyden Chemical Corporation, Del., 90 A.2d 660. In the case at bar there were no employment contracts entered into by option holders in exchange for options. The options, as has been noted, were exercisable on receipt. Furthermore, the inducement to remain an employee contained in the provisions of the Internal Revenue Act of 1950 governing stock options is not a legally sufficient assurance that the corporation will receive the benefits bargained for, Kerbs v. California Eastern Airways, supra.
In short had options not as yet been granted under the plans here attacked, plaintiff would be entitled to injunctive relief inasmuch as there is nothing in the plans or in the circumstances surrounding them which a Court could regard as[6] assurance that the corporation would receive in return the stimulated efforts anticipated from the granting of options.
Defendants' arguments in support of the validity of the disputed options are necessarily based on events occurring after the options were granted, it being first contended that unlike the situation in the Kerbs case where suit was brought before options had been issued, suit in the case at bar was filed in February 1953 long after the optionees had not only acquired stock under both plans but had also continued to perform services. It is argued for defendants that this performance of services (which incidentally continue to be furnished by the forty eight surviving option holders) has supplied the needed legal consideration for the grant of the options and further that the options have in effect been earned as a bonus payable at the end of a stated period *315 of work. The answer to these arguments is that if the options were defective when granted for the reasons heretofore stated, they could not be made good by later events which were not elements of the original[7] grants. It may seem captious to decline to find consideration in the undisputed fact that the option holders have not only remained with the corporation but have to some extent changed position by exercising options but to give legal weight to this occurrence is as counsel for plaintiff puts it to confuse post hoc with propter hoc. Secondly, because the options were immediately exercisable and there were no covenants given by option holders designed to insure their continued services, defendants' cases on benefits payable at an employee's death or after some other calculable period of work are not in point.
Defendants' contention that consideration for the options is to be found in the services actually furnished by those who have been benefited by the options brings into focus the true nature of plaintiff's complaint. Suits such as this are directed not against the exercise of options but against their improper grant, Elster v. American Airlines, Del.Ch., 100 A.2d 219. Once options are granted it is for the Court to determine on sufficiently prompt stockholder objection whether or not the grants were made for legal consideration. I am unable to find legal consideration for the plans at the times options were granted. While it is conceded that consideration for an option plan might be found in a proper case in specific benefits looked for and gained by the corporation as a result of option inspired efforts on the part of those benefited, this is not that case.
Defendants next contend that an amendment to § 157 of Title 8 Del.C., which became effective July 8, 1953, and which makes conclusive the judgment of corporate directors as to the consideration for the issuance of stock options and the sufficiency thereof, and the actions of the directors and option holders thereafter taken, supply consideration for the plans under attack.
On September 28, 1953, the directors of the corporate defendant resolved that it was their consensus that the corporation had received and would receive good and sufficient consideration for the options granted under the 1951 and 1952 option plans. At the same meeting the directors further resolved in order "* * * further to insure the validity of said options and thus to advance the interests of this Corporation * * *" to obtain employment contracts from all option holders for a period of at least forty months from the date of the grant of options. In January 1954, all option holders, except for one who had died in the interim, signed the employment contracts as of the date options were received.
Defendants contend that the resolution in itself supplied the necessary directorial recognition that the option plans were supported by consideration and if it did not, then the contracts entered into by the option holders supply the missing peppercorn. The answer to these arguments in my opinion lies again at the heart of plaintiff's complaint, which is, as has been noted, directed against the issuance of options. *316 In my opinion it is unnecessary to decide whether or not the[8] amendment to § 157 of Title 8, Del.C. (which was enacted to place the judgment of directors on the consideration for options on a par with their judgment on the consideration for the issuance of stock) is intended to be prospectively effective or curative and whether or not the employment contracts were[9] illusory, because what is here at issue is not corporate judgment as to consideration or its sufficiency but the very existence of consideration as of the time the options were granted. Compare Holthusen v. Edward G. Budd Mfg. Co., D.C.E.D.Pa., 52 F.Supp. 125. As I have found there was no legal consideration for the original grant of options, it necessarily follows that the directors' resolution of September 1953 was without effect and that the employment contracts of January 1954, obviously not given in exchange for the issuance of options in 1951 and 1952, came too late.
Defendants have abandoned affirmative defenses which plead New York law governing offers in writing and laches but rely on Article 12 of the corporate charter which provides:
"Any contract, transaction or act of the Corporation * * * which shall be ratified by a majority of a quorum of the stockholders * * * shall, except as otherwise specifically provided by law, be as valid and as binding as though ratified by every stockholder of the Corporation * * *"
Defendants argue (assuming the option plans lack formal consideration) that under this charter provision the majority of stockholders who approved the option plans accomplished what would normally require a unanimous vote, that is a majority of a quorum of stockholders could and did legally make a gift of corporate assets by ratifying the transactions of which plaintiff complains. It is contended that by this charter provision adopted over twenty five years ago and by which plaintiff is bound, the corporate defendant freed itself from the common law principle that a gift of corporate assets requires unanimous stockholder approval.
Charter provisions which facilitate corporate action and to which a stockholder assents by becoming a stockholder are normally upheld by the court unless they contravene a principle implicit in statutory or settled decisional law governing corporate management, § 102(b) (1), Title 8, Del.C., Sterling v. Mayflower Hotel Corp., Del., 93 A.2d 107. It is not only implicit in amended § 157 of the Delaware Corporation Law that options must be issued for consideration and in § 122(9) of the same law that corporate gifts may be made solely for the public welfare or for charitable, scientific or educational purposes but there is also an accepted corporate rule that majority stockholders have no power to give away corporate property against the protest of the minority, Rogers v. Hill, 289 U.S. 582, 53 S.Ct. 731, 77 L. Ed. 1385. The case of Butler v. New Keystone Copper Co., 10 Del.Ch. 371, 93 A. 380, cited by defendants is clearly distinguishable. In that case this Court upheld a charter provision which in derogation of the common law explicitly permitted a sale of the whole or substantially the whole of corporate assets on authorization of 75% of the voting stock. The common law had required unanimous stockholder approval for a sale of assets of a going concern but such *317 rule had lost its force at the time of the decision. The Delaware Corporation Law which at the time did not contain a section governing sales of assets was shortly thereafter amended by adding a section which specifically authorized a sale of corporate assets on the affirmative vote of a majority of the voting stock. Furthermore, in the case at bar, Article 12 of defendant's charter rather than purporting to vary an established rule of corporate conduct is by its very terms clearly intended to be applied in a way that meets the accepted rule that a corporation may not make a gift of corporate assets to its executives if a single stockholder objects.
On notice, judgment will be entered for plaintiff and the corporate defendant in which the Court will reserve for decision after further hearings the nature and extent of the appropriate relief to be granted.
NOTES
[1] Plaintiff owned 100 shares of stock of the corporate defendant at the time of the stockholder vote on the first plan. He did not vote for or against such plan. At the time of the stockholder vote on the second plan plaintiff held 125 shares and voted them against such plan. No shares were voted against the first plan and a total of 225 shares were voted against the second plan.
[2] Gifts of corporate assets except as authorized by § 122(9) of Title 8, Del.C. require unanimous stockholder approval. The cited section of the Delaware Corporation law permits corporations to "Make donations for the public welfare or for charitable, scientific or educational purposes."
[3] The corporate defendant is an established shipping line founded in 1913. It has doubled its shipping capacity since World War II and at the end of 1952 had assets approaching $94,000,000.
[4] The corporate defendant being a federally subsidized shipping line, was subject to the salary limitations fixed by § 805(c) of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1223(c). The provisions limiting salary payments were finally repealed in July, 1952 after their unfairness had been fully reviewed in Committee hearings. The limit on salaries was particularly discouraging to junior executives whose salaries were necessarily graded down because of the low ceiling at the top.
[5] See Kaufman v. Shoenberg, Del.Ch., 91 A.2d 786.
[6] Compare Sandler v. Schenley Industries, 32 Del.Ch. 46, 79 A.2d 606, where the grantee of options broke former business ties to enter Schenley's employ and agreed to purchase stock in installments.
[7] In the Kerbs case options were not issued until defendant won its case in the Court below. On reversal in the Supreme Court the Chancellor enjoined the issuance of additional options and cancelled outstanding options as well as stock which had been issued to option holders. On a second appeal the case was settled before argument and a special mandate approved the issuance to named persons of a limited number of options exercisable in futuro in confirmity with a settlement agreement. The mandate permanently enjoined the option plan but permitted the corporation to recognize certain options including those allotted to two persons who were not named in the plan. The mandate apparently constituted no more than court approval of a negotiated termination of private litigation which was non-derivative in form. Radin v. Barker, Civil Action 519, Del.Ch. (New Castle County) was a voluntary dismissal of a derivative suit against the granting of stock options, to which no stockholder objected.
[8] § 157 of Title 8, Del.C. effective July 8, 1953, provides in part, "In the absence of actual fraud in the transaction, the judgment of the directors as to the consideration for the issuance of such rights or options and the sufficiency thereof shall be conclusive."
[9] While the option holders bound themselves to substantial periods of employment there was not only no exchange of employment agreement for option but more importantly the employer reserved * * * "the absolute right to change or terminate the employment or compensation * * *" of the option holder. In Kaufman v. Shoenberg, supra, while the corporation reserved the right to terminate employment, it bound itself "reasonably (to) determine" the option holder's compensation while employed.