PRENTICE I. ROBINSON AND ROSALIE ROBINSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

CENTRONICS DATA COMPUTER CORP. AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 18038–80, 2951–82.     Filed March 13, 1984.

*Jerome S. Hertz, Elizabeth B. Burnett, David S. Crane, Steven S. Harwood,* and *Maxwell D. Solet,* for the petitioners in docket No. 18038–80.

*Dennis I. Meyer* and *Bertrand M. Harding, Jr.,* for the petitioners in docket No. 2951–82.

*Willard J. Frank* and *Richard E. Trogolo,* for the respondent.

WHITAKER, *Judge*: Respondent determined a deficiency of $1,446,365.51 in the income tax of the petitioners Prentice I.

and Rosalie Robinson (the Robinsons) in docket No. 18038–80 for the taxable year 1974, based upon their failure to report income in that year from the exercise of a stock option (the Option) granted Prentice I. Robinson (Robinson) by Centronics Data Computer Corp. and Subsidiaries (Centronics), the petitioner in docket No. 2951–82. Among other items, respondent determined a deficiency in Centronics' income tax in its 1975 taxable year caused by the disallowance of a $2,958,000 deduction Centronics claimed that year in connection with the Option granted Robinson.[1] The issue of Centronics' entitlement to this deduction was severed from the remaining issues in its petition and consolidated for purposes of trial, briefing, and opinion with Robinson's petition. The issues of the year in which Robinson is liable for tax on income from exercise of the Option, the year in which Centronics is entitled to a deduction, were severed for purposes of trial, briefing, and opinion from the issues of the value of the stock in question and hence, respectively, the amounts of income and deduction of petitioners Robinson and Centronics. This timing question, which depends initially upon the interpretation of section 83(i)(2)[2] of the Internal Revenue Code, is presently before the Court.

## FINDINGS OF FACT

The parties filed a stipulation and supplemental stipulation of facts. Centronics and respondent filed an additional stipulation, reproduced below.[3] The facts as stipulated are so found.

---

[1] Respondent determined deficiencies in Centronics' income tax of $3,636,042 and $3,924,309 for the taxable years ending June 30, 1975, and June 30, 1976, respectively.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended.

[3] Centronics and respondent stipulated as follows:

50. If the Court determines that Robinson became "substantially vested," as that term is defined in Treas. Reg. § 1.83–3(b), in his 153,000 shares of Centronics common stock on a date set forth in the left-hand column below, then Centronics would be allowed a deduction under sections 83(h) and 162 of the Code (in whatever amount determined by the Court) for the taxable year of Centronics as set forth in the corresponding right-hand column below:

| Date of substantial vesting | Allowable taxable year of deduction |
| --- | --- |
| Mar. 4, 1974 | June 30, 1974 |
| Mar. 19, 1974 | June 30, 1974 |
| May 1, 1974 | June 30, 1975 |
| Sept. 4, 1974 | June 30, 1975 |
| Sept. 19, 1974 | June 30, 1975 |
| Mar. 4, 1975 | June 30, 1976 |
| Mar. 19, 1975 | June 30, 1976 |

See sec. 1.83–6(a)(3), Income Tax Regs.

The Robinsons resided in New Hampshire at the time their petition in this case was filed. The Robinsons were calendar year taxpayers and filed a timely joint income tax return for the year 1974.

Centronics was incorporated in Delaware in 1968 and maintained its principal place of business in New Hampshire when it filed its petition in this case. Centronics filed timely consolidated income tax returns for its taxable years ending June 30, 1974, June 30, 1975, and June 30, 1976. Robert Howard (Howard) was president, and Samuel Lang (Lang) was vice president of Centronics at the time of its incorporation and for all relevant years thereafter. At the time of incorporation, Howard and Lang each owned a 50-percent interest in Centronics. Centronics was formed to implement and operate a computer gaming system for use in casinos owned and patented by a Nevada corporation in which Howard and Lang were shareholders. Development of these rights was assisted by Wang Laboratories, Inc. (Wang). The patent rights later were transferred to Centronics.

Robinson became an employee of Wang in 1962 and remained on Wang's payroll in the status of a full-time employee through the end of April 1969, although in fact he was working at that time also for Centronics, as more fully developed below. Prior to January 1969, Robinson discussed with Howard and Lang his leaving Wang for employment with Centronics, a client of Wang. In January 1969, as an employee of Wang, Robinson spent approximately 3 weeks in Puerto Rico installing for Centronics a computer gaming system in a casino. While there, Robinson continued to discuss with Howard and Lang his future employment with Centronics. At this time, Howard owned 155,000 shares and Lang owned 147,000 shares of Centronics' 371,300 shares of outstanding stock, constituting approximately 41 percent and 39 percent, respectively, of the shares outstanding.

During Robinson's stay in Puerto Rico, the parties informally agreed[4] that Robinson would leave Wang for Centronics if certain matters could be resolved. The informal agreement

---

[4]The words "agreed" and "agreement" are used herein solely for convenience, without intending to signify that a contract or contracts enforceable under applicable law had been made.

contemplated that Robinson would receive an annual salary of $25,000 and that Howard and Lang would each transfer, at a nominal price, 5,000 shares (10,000 shares total) of their Centronics stock to Robinson when he joined the corporation. The parties further informally agreed that Centronics would attempt, in some as-then-undetermined manner, to allow Robinson to acquire a stock interest in the company, in addition to the stock to be sold to him by Howard and Lang, individually. Robinson understood that Howard did not then intend to make a binding offer of employment to Robinson. Robinson refused to commit himself to accept an offer of employment by Centronics until he had satisfied himself after conversations with the president of Wang, Dr. An Wang (Dr. Wang), that Robinson's entitlement to exercise a stock option previously granted him by Wang would not be jeopardized. The terms of the Wang stock option required that Robinson remain employed by Wang through April 18, 1969. During and at the conclusion of the January 1969 conversations, Robinson understood that he would be required to execute written agreements with Centronics covering terms of employment and compensation as ultimately agreed upon.

As of February 4, 1969, counsel for Centronics drafted a letter to be sent to the shareholders informing them that Robinson and the management of Centronics had reached an informal and nonbinding understanding, whereby Robinson would join Centronics on approximately April 1, 1969, contingent upon Centronics' agreeing to grant Robinson an option to purchase 17,000 shares of the corporation's common stock at $6 per share.[5] Ultimately, the parties agreed to an option to purchase 25,500 shares at $4 per share. The letter drafted by counsel also indicated that the parties had agreed that Howard and Lang would transfer a total of 10,000 of their personally held shares to Robinson. Ultimately, the parties agreed to a transfer of 15,000 shares. These facts further confirm the tentative nature of the understanding reached in January.

Although an exact date is uncertain, sometime in early February 1969 Dr. Wang and Howard agreed that Robinson would remain on Wang's payroll through the end of April 1969

---

[5] It is unclear whether (or the extent to which) this letter was distributed to shareholders.

at his then-current yearly salary of $18,000, thus protecting Robinson's Wang stock option. The parties agreed that during this period Robinson would be available to Wang as required to complete his projects and as otherwise necessary to effect a smooth transition, and that he would be available commencing in February 1969 to Centronics on an at-will, part-time basis. Centronics agreed to pay Robinson the difference between his $18,000 Wang salary and the sum of $25,000 per year, the starting salary agreed upon with Centronics. Robinson received one check from Centronics for February and weekly checks thereafter. Commencing May 1, 1969, Centronics began paying Robinson full installments of his $25,000 annual salary. During the period February 1969 through April 1969, Robinson established a place of business for Centronics in New Hampshire and hired other employees for it.[6]

On April 10, 1969, the board of directors of Centronics voted upon and unanimously passed a resolution (the resolution) authorizing the granting to Robinson of an option to purchase 25,500 shares of Centronics stock at $4 per share, effective upon his entering into written employment and option agreements, including, of course, his acceptance of specified terms and conditions of the two agreements. The resolution authorized Howard, as president, to prepare, execute, and deliver to Robinson an option agreement consistent with the terms of the resolution. The option agreement, as executed, required Robinson to offer to sell shares purchased pursuant to the Option to Centronics, if he were either to terminate or to have terminated for cause during its 5-year term his employment agreement with Centronics,[7] or if he intended to dispose of any such shares so purchased within 1 year of their purchase.[8] The parties had not previously discussed these repurchase conditions, and Robinson did not become aware of them until presented with the option agreement for his execution. These conditions were part of the material consideration to Centronics for the granting of the Option.

---

[6]We have not found it necessary to make any findings of fact or conclusions of law concerning the legal ramifications, if any, of this part-time employment other than as affecting Robinson's rights and Centronics' obligations respecting the Option.

[7]See sec. (2) of the Option Agreement, p. 449 *infra.*

[8]See sec. (3) of the Option Agreement, p. 449 *infra.*

Pursuant to the resolution, counsel for Centronics drafted an employment agreement (the Employment Agreement) and an option agreement (the Option Agreement). The Employment Agreement preamble stated: "THIS AGREEMENT made as of the 1st day of May, 1969 * * *." Its final paragraph read: "SIGNED and SEALED THIS ___ day of _____, 1969." The blanks are not completed on the executed copy. The Employment Agreement provided for a 5-year term, to terminate on April 30, 1974. The Option Agreement was not dated where executed on its final page by Howard and Robinson but was dated on its front page, "May 1, 1969." The "1" was handwritten in a space left blank by the document's typist. The Option Agreement provided, in pertinent part:

In the interest of its future business, the Company desires that you, as its Chief Engineer, shall have a financial interest therein, as a stimulus to vigorous attention by you to the Company's affairs, and, as an inducement to you to acquire such interest, the Company hereby grants you an option to purchase an aggregate of 25,500 shares of its common stock, par value 1¢ per share, at $4 per share, subject to all of the terms and conditions hereinafter stated:

(1) The term of this option shall be from the date hereof until April 30, 1974. * * *

(2)[9] If your employment by the Company shall be terminated for cause, or if you shall leave the Company's employment for any reason other than the expiration of the term of your employment agreement, or your death, then the option granted hereby shall terminate simultaneously with such event. In the event of your death, the option herein granted shall be exercisable for a period of one year thereafter by your estate or by the person who shall have acquired the right to exercise such option by bequest or inheritance. In addition, you agree to offer to sell to the Company all of the shares theretofore purchased by you pursuant to the option and still not disposed of, if any, free and clear of any pledge, at the price of $4 per share; said offer to be in writing. * * *

(3)[10] In addition, if you propose to make disposition of any of the shares within one year from the date same are acquired by you, then prior to such disposition you agree to offer to sell such shares to the Company free and clear of any pledge, at the price of $4 per share; said offer to be in writing. * * *

*   *   *   *   *   *   *

(5) You further agree that the certificates evidencing the shares acquired by you pursuant thereto may, at the Company's discretion, bear a legend to

---

[9]Hereinafter referred to as sec. (2).
[10]Hereinafter referred to as sec. (3).

the effect that the shares acquired by you have not been registered under the Securities Act of 1933 and that no disposition of same shall be made until either such registration is in effect as to such shares or the Company has received opinion of counsel satisfactory to it that an exemption therefrom is, in fact, applicable to such shares, and/or to the effects as set forth in (2) and/or (3) above. Nothing herein contained shall impose any obligation on the Company to register any of the shares optioned hereby.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(7) The agreement contained herein shall be binding upon the successors and assigns of the Company and your heirs, executors and administrators. This option is not assignable or transferable either voluntarily, by operation of law or otherwise than by will or by the laws of descent and distribution.

This offer is being made pursuant to authority granted by the Directors of the Company, as set forth in the minutes of a meeting of said Directors on April 10, 1969.

Upon receipt from you of the enclosed copy of this letter signifying your agreement to all of the terms and conditions herein contained, the option herein set forth shall become effective.

Centronics granted the Option in consideration for Robinson's agreement to join Centronics and remain for a 5-year term. Section (3) was patterned upon Howard's incorrect understanding of section 16(b) of the Securities Exchange Act of 1934 (sec. 16(b)).[11]

The Employment Agreement was drafted in final form by counsel for Centronics on or before April 17, 1969, which was a Tuesday. On that day or thereafter, counsel for Centronics drafted in final form the Option Agreement. Between Tuesday, April 17, 1969, and Monday, April 30, 1969, the exact date being incapable of determination, Howard traveled to New Hampshire and hand-delivered the unexecuted documents to Robinson.[12] He returned to New York with the documents executed by Robinson and hand-delivered them to counsel for Centronics to hold until May 1, 1969, the date which appeared

---

[11]15 U.S.C. sec. 78p(b) (1981).

[12]The evidence is unclear as to the exact date of this trip. During 1969, Howard usually went to New Hampshire on a Monday or Tuesday, and he recalls that this particular visit lasted 3 or 4 days. Thus, the trip may have occurred during the week of Apr. 17, 1969, or it may have been the following week. Mr. Howard had agreed to bring the documents back to Mr. Coller (Centronics' counsel) in New York after Mr. Robinson signed them, to be held there until May 1, 1969. Based upon Howard's customary traveling practices, the earliest date on which Howard could have returned from New Hampshire with the documents executed by Robinson was Friday, Apr. 20, 1969. Under these circumstances, it is highly unlikely that they were delivered to Mr. Coller, executed by both parties, before the following Monday, Apr. 23, 1969. It appears much more likely that the trip occurred in fact during the week of Apr. 23, 1969.

on both documents, pursuant to the understanding and intent of both Howard and counsel for Centronics. The date on which the documents were executed by Howard on behalf of Centronics is uncertain, but that event did not occur, at the earliest, until after Robinson had executed both contracts. It is clear that Howard did not deliver executed copies of the documents to Robinson until, at the earliest, May 1, 1969. On May 10, 1969, Howard and Lang each transferred to Robinson 7,500 shares of their personally held Centronics stock. The parties to these contracts at all times intended that the contracts would be effective on, but not before, May 1, 1969.

In 1973, Howard and Robinson agreed that the Employment Agreement with Centronics would be extended for an additional 5-year term commencing on April 30, 1974, and that, except for an increase in salary, all other terms and conditions of the Employment Agreement would remain in effect. By letter dated April 10, 1974, Howard advised Robinson that section (2) of the Option Agreement would not extend beyond April 30, 1974, the term of his original Employment Agreement, but that section (3) of the Option Agreement would remain in effect.

Because of various changes that had occurred in the capital structure of Centronics subsequent to the execution of the Option Agreement, by March 4, 1974, Robinson was entitled under the Option Agreement to acquire 153,000 shares of Centronics stock at a price of 66.7 cents per share. On March 4, 1974, Robinson fully exercised the Option and delivered to Centronics a check in the amount of $102,000. On March 19, 1974, Centronics issued to Robinson a stock certificate representing his 153,000 shares (the Option Stock). The Option Stock was issued by Centronics to Robinson in connection with the performance of services by Robinson within the meaning of section 83(a).

The certificate evidencing the Option Stock bore the following legend (the Legend):

The shares represented by this certificate have not been registered under the Securities Act of 1933 and may not be sold, offered for sale or otherwise transferred or disposed of unless a registration statement under such Act is in effect with respect thereto or unless the company has received an opinion of counsel satisfactory to it, that an exemption from such registration is applicable to said shares.

The stock was also subject to a so-called stop transfer order (Stop Transfer Order) delivered to Centronics' transfer agent. The Stop Transfer Order required the transfer agent, prior to acting upon a request to transfer the stock in the name of a new owner, to notify Centronics and to decline to effect the transfer without the approval of Centronics and without an opinion of its counsel that the transfer did not violate the Securities Act of 1933.[13] The certificate did not, in the Legend or otherwise, refer either to section (2) or section (3).

Because of his "insider" status in the company, from at least September 1969 until the end of his employment, Robinson was subject to section 16(b). This provision in part requires insiders who realize profits from the sale of stock acquired less than 6 months prior thereto to transfer any profits realized to the issuing corporation.

The parties have stipulated that the determination of the date the Option was granted within the meaning of section 83(i)(2) is controlled by Delaware law.

## ULTIMATE FINDINGS OF FACT

The Option was granted on May 1, 1969. Prior to that date, Robinson had no right to acquire stock from Centronics pursuant to the Option Agreement or any other enforceable agreement, formal or informal. Notwithstanding the Legend, at any time during the period March 4, 1974, to March 4, 1975, Robinson could have pledged the Option Stock or could have sold it in a private resale as defined in, and pursuant to, the Securities Act of 1933 and the rules and regulations of the Securities and Exchange Commission. A purchaser in such a private resale could have committed himself to the purchase of the stock from Robinson before actually becoming aware of the existence of section (3).

## OPINION

### I. APPLICABILITY OF SECTION 83

The threshold question to be decided here is whether the exercise of the stock option is governed by section 83. Section

---

[13]The supplemental stipulation gives a more detailed description of the Stop Transfer Order and its effect than does the original stipulation. Hence, we have followed the former.

83(a) applies to the taxation of property transferred in connection with the performance of services,[14] formerly taxed under section 1.421–6, Income Tax Regs. The parties have agreed that whether section 83(a) applies in the present case depends upon whether the Option was granted to Robinson before or after April 22, 1969. Sec. 83(i)(2).[15]

Section 83 does not define the term "grant" or indicate when an option should be deemed "granted" for purposes of section 83(i)(2); neither do the regulations, the case law, or the statute's legislative history. We look, therefore, to the ordinary and common usage of the term "grant" in applying the statute.[16] The natural, ordinary, and familiar meaning of the term "grant" is "to give the possession or title of, esp. by a deed or formal writing."[17] An option is "A right, which acts as a continuing offer, given for consideration, to purchase or lease property at an agreed upon price and terms, within a specified time."[18] A stock option is "The right to buy stock in the future at a price fixed in advance."[19] Applying the ordinary meanings of these terms, we conclude as a matter of law, that Robinson was "granted" the Option at the time he acquired a vested

---

[14]Sec. 83(e) provides certain limits to the application of these rules, none of which is here applicable.

[15]Sec. 83(i)(2) provides as follows:

(i) TRANSITION RULES.—This section shall apply to property transferred after June 30, 1969, except that this section shall not apply to property transferred—

\* \* \* \* \* \* \*

(2) upon the exercise of an option granted before April 22, 1969[.]

[16]In cross-motions for summary judgment, Robinson urged that we apply the definition of "date of grant" contained in sec. 1.421–7(c)(1), Income Tax Regs. We denied both motions by memorandum sur order dated June 28, 1983, since we concluded that disputed facts might have a material bearing on the issue. We noted, however, that sec. 1.421–7(c), Income Tax Regs., specifically limits its application to Code secs. 421 through 425, i.e., qualified stock option plans. Because the statutory requirements and tax treatment of such plans are significantly different from the option at issue, the special rules and definitions provided specifically for qualified stock options should be limited in application to such options to the extent such rules or definitions vary a term's ordinary meaning. See, e.g., 1 J. Mertens, Law of Federal Income Taxation, secs. 3.14, 3.15, at 24–28 (1981 rev.). Upon reconsideration of our ruling as requested by Robinson, we have again concluded that the regulation is not applicable in this case. We, therefore, will not apply the definition of "date of grant" contained in sec. 1.421–7(c), Income Tax Regs., to the extent that such definition varies the term's ordinary meaning. For the same reason, our decision in *Morris v. Commissioner*, 70 T.C. 959 (1978), is inapposite.

[17]Webster's Third New International Dictionary 989 (1981); see Black's Law Dictionary 629 (rev. 5th ed. 1979).

[18]Black's Law Dictionary, *supra* at 986; see Webster's Third New International Dictionary, *supra* at 1585.

[19]Black's Law Dictionary, *supra* at 987; see Webster's Third New International Dictionary, *supra* at 2247.

right to purchase stock pursuant to the terms of the Option.[20] We look to Delaware law to resolve this issue.[21]

Under Delaware law, a valid stock option requires that the corporation granting the option receive (1) valuable consideration in return for its grant of the option, and (2) assurances at the time the option is granted that the contemplated consideration will in fact pass to the corporation. *Beard v. Elster*, 39 Del. Ch. 153, 160 A.2d 731, 735–736 (Del. 1960).[22] Whether adequate assurances exist depends upon the particular facts of the case at bar. *Kerbs v. California Eastern Airways*, 33 Del. Ch. 69, 90 A.2d 652, 656 (Del. 1952).

Where the consideration for an option is the grantee's acceptance of employment and willingness to remain for a given term, a duly authorized stock option is nonetheless invalid and unenforceable absent the execution of an agreement containing terms sufficient to assure passage of the contemplated consideration, i.e., the continuance of employment for the agreed-upon period. This requirement may be met by an employment agreement for the specified period or the imposition of other conditions sufficient to provide the incentive for continuation of employment for the required period. *Ash v. Brunswick Corp.*, 405 F. Supp. 234 (D. Del. 1975); *Gruber v. Chesapeake & Ohio Railway Co.*, 158 F. Supp. 593 (N.D. Ohio 1957); *Frankel v. Donovan*, 35 Del. Ch. 433, 120 A.2d 311 (Del. Ch. 1956); *Gottlieb v. Heyden Chemical Corp.*, 33 Del. Ch. 82, 90 A.2d 660 (Del. 1952); *Kerbs v. California Eastern Airways, supra.*

As we have found, Centronics granted the Option in return for Robinson's promise to accept employment by Centronics and remain as an employee for a 5-year term. Prior to Robinson's execution of the Employment and Option Agreements, there existed no reasonable assurance that this contem-

---

[20]There was no provision in Robinson's Option Agreement that postponed his right to exercise the Option, although that is a fairly customary stock option provision. Hence, we do not have to distinguish between the date upon which the Option Agreement became effective and the date on which Robinson's right to exercise the Option accrued.

[21]State law creates legal interests and rights. The Federal revenue acts designate what interests or rights, so created, shall be taxed. *Morgan v. Commissioner*, 309 U.S. 78 (1940). The legal interests of parties to a stock option are controlled by the law of the State in which the corporation issuing the option is incorporated. *Rogers v. Guaranty Trust Co.*, 288 U.S. 123 (1933). *Beard v. Elster*, 39 Del. Ch. 153, 160 A.2d 731 (Del. 1960). See also 1 B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 4.1.4, at 4–11—4–15 (1981).

[22]See also *Olson Bros. Inc. v. Englehart*, 245 A.2d 166 (Del. 1968); *Gottlieb v. Heyden Chemical Corp.*, 33 Del. Ch. 82, 90 A.2d 660 (Del. 1952).

plated consideration would pass to Centronics. See *Beard v. Elster, supra* at 736. Nor, prior to that time, was there a meeting of the minds, since Robinson was not even aware until presented with the document for execution that his rights to acquire stock under the Option would be restricted by sections (2) and (3) of the Option Agreement. These provisions added conditions to the two agreements which obviously are in pari materia. Thus, prior to that time there was, under Delaware law, no valid option, i.e., no legal right vested in Robinson to purchase stock pursuant to the terms of an option contract. Moreover, we cannot accept Robinson's position that de facto option and employment agreements existed on April 10, 1969, the date of the board of directors resolution that provided the Option. The intent of the parties clearly was that written contracts embodying their agreements were to be drafted at some future time and signed by Robinson. We must conclude, therefore, that they did not intend to create a contract until those written agreements were duly prepared and executed.

In *Keystone Surgical Supply Co. v. Bate*, 196 Pa. 566, 46 A. 887 (1900), a case containing facts very similar to those herein, the Pennsylvania Supreme Court determined that acceptance of an offer by a board of directors did not constitute a contract where the actions of the parties were clearly preliminary to execution of a contract. The court stated:

It may be conceded that the offer and acceptance amounted to a meeting of the minds of the parties, and would be sufficient to constitute a contract between them, if they so understood and intended. But where parties to an arrangement of this kind show, either by express words or by their action, that they regard it as preliminary only, and to be put into final shape thereafter, and subsequently execute a formal instrument in writing, the latter is the only contract, and the preliminary steps, however elaborate, go into the category of mere negotiations leading up to the final result. This is always the presumption of the law where a written contract is made, and in the present case it is rendered conclusive by the circumstances. The meeting by a separate resolution directed the secretary to notify the defendants of the acceptance of their proposal, showing knowledge that something more than the mere acceptance was necessary to complete the contract. Subsequently, on March 16th, the written contract was executed, and it embodied some provisions that were not in the proposal or the acceptance,—such as the agreement of the defendants to build according to the specifications submitted to and accepted by the plaintiff, and the stipulation by the plaintiff that the mortgage it was to give in payment should be a purchase-money mortgage and payable in five years. These provisions, it is true, are in harmony with the prior arrangement, and are merely supplementary to it;

but, if they had been in any way in conflict, they must have prevailed, as the final agreement of the parties. * * * [46 A. at 887.]

The four corners of the agreements, themselves, further support the view that there was no contract until May 1, 1969. The Option and Employment Agreements were executed sometime between April 17 and April 30, 1969. It is simply impossible to determine from the available evidence the exact date of this event. However, it is clear that the parties intended the Employment and Option Agreements to be effective as of, and not before, May 1, 1969.[23]

Robinson began working for Centronics sometime early in February 1969. Had the parties desired, they could have drafted and executed these documents promptly thereafter. Obviously, their intent was to delay the effective date of these documents, at least in part so that Robinson could qualify for the Wang stock option. Giving effect to the parties' manifest intent, we have found that, prior to May 1, 1969, Robinson had no right to purchase stock pursuant to the terms of the Option Agreement. Therefore, we conclude that the Option was not "granted" prior to April 22, 1969, and Robinson's tax liability for income secured therefrom is governed by section 83(a).

Robinson argues that an enforceable agreement was in fact reached in January 1969 or shortly thereafter. In support of this argument, he relies upon cases such as *Vale*[24] and *Pennsylvania Co.*[25] However, these cases do not stand for the proposition that a contract exists before the parties so intend. In *Vale*, the Delaware Court of Chancery merely held that at the pleading stage it could not hold as a matter of law that the absent terms were so essential as to make the agreement unenforceable. Rather, evidence of the parties' intent needed further development, and thus defendant's motion to dismiss was denied. *Vale v. Atlantic Coast & Inland Corp.*, 34 Del. Ch. 50, 99 A.2d 396, 399 (Del. Ch. 1953). In *Pennsylvania Co.*, the court denied defendants' motion for summary judgment where further facts were needed to ascertain whether the parties

---

[23]We base this conclusion on the language of the agreements, and the actions of the parties, including the intentional delay until May 1, 1969, in the delivery to Robinson of the executed Option and Employment Agreements.

[24]*Vale v. Atlantic Coast & Inland Corp.*, 34 Del. Ch. 50, 99 A.2d 396 (Del. Ch. 1953).

[25]*Pennsylvania Co. v. Wilmington Trust Co.*, 39 Del. Ch. 453, 166 A.2d 726 (Del. Ch. 1960), affd. in part and appeals dismissed in part 40 Del. Ch. 1, 172 A.2d 63 (Del. 1961).

intended a letter to constitute a binding agreement and whether an appropriate remedy for breach could be fashioned under Pennsylvania law. Because the plaintiff, with regard to the latter issue, might have been able to produce evidence which would have justified a finding that a contract existed and that an appropriate remedy could be fashioned, summary judgment was inappropriate. *Pennsylvania Co. v. Wilmington Trust Co.*, 39 Del. Ch. 453, 166 A.2d 726, 733. Thus, these cases are hardly on point. The issue here is not whether Robinson should be allowed to produce evidence as to whether he could have sought damages or specific enforcement against Centronics if it had declined to grant a stock option as of May 1, 1969. Rather, the issue is when the stock option, which was an essential element of Robinson's employment by Centronics, was "granted" within the meaning of section 83(i). The parties' manifestations of their intent showed that there was no contract prior to May 1, 1969.

## II. DATE OF TRANSACTION FOR TAX PURPOSES

The only other question to be addressed in this opinion is the tax year in which the value of the stock minus its cost should have been included in Robinson's income and should have been deducted by Centronics. The Option Stock was transferred to Robinson, as we have found, in connection with his performance of services for Centronics. Thus, section 83 is applicable. Under section 83(a),[26] property transferred in connection with the performance of services is taxable when rights to the beneficial interest in the property first become either transferable or not subject to a substantial risk of forfeiture. Thus, if Robinson's interest in the stock was *either* transferable *or* not subject to a substantial risk of forfeiture

---

[26]Sec. 83(a) provides:

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—
(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
(2) the amount (if any) paid for such property,
shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

during 1974, the value of the stock minus the amount paid for it must be included in income during that year.

With respect to Centronics, section 83(h) provides:

SEC. 83(h). DEDUCTION BY EMPLOYER.—In the case of a transfer of property to which this section applies or a cancellation of a restriction described in subsection (d), there shall be allowed as a deduction under section 162, to the person for whom were performed the services in connection with which such property was transferred, an amount equal to the amount included under subsection (a), (b), or (d)(2) in the gross income of the person who performed such services. Such deduction shall be allowed for the taxable year of such person in which or with which ends the taxable year in which such amount is included in the gross income of the person who performed such services.

Centronics' fiscal year ending June 30, 1975, includes the last day of Robinson's calendar year 1974. However, for accrual basis taxpayers, respondent's regulations allow certain exceptions. The year in which Centronics is entitled to a deduction, based on our decision as to Robinson, will be derived from the stipulation entered into by Centronics and respondent. See note 3 *supra*.

The first prong of Robinson's argument deals with section (3), which granted a right of first refusal to Centronics to purchase shares sold within a year of purchase. He first argues that, until that provision lapsed on March 4, 1975, his rights to the stock were both nontransferable and subject to a substantial risk of forfeiture.[27] In the second prong, he argues that section 16(b) subjected the Option Stock to a substantial risk of forfeiture and rendered the Option Stock nontransferable until September 1974. Centronics and respondent argue that the Option Stock was both transferable and not subject to a substantial risk of forfeiture on March 4, 1974, the date Robinson exercised the Option.[28] We agree with Centronics and respondent.

In various contexts, Robinson reiterates that section 83 was adopted to prevent tax-motivated restrictions without real

[27]Sec. (2) of the Option Agreement is not a subject of this controversy. The parties have agreed to ignore this restriction for purposes of valuing the stock and determining the timing of Robinson's liability, apparently because the value of the stock was constant between its purchase on Mar. 4, 1974, and the lapse of the restriction on Apr. 30, 1974.

[28]We have used Mar. 4, 1974, the date of exercise, rather than Mar. 19, 1974, the date of issue of the certificate because all three parties have assumed that the date of exercise of the Option is the critical one.

substance from being granted tax recognition. Since, as he argues, section (3) was not tax motivated, the statute, regulations, and this restriction should be construed so as to give it effect in the valuation of the Option Stock. Although Congress enacted the statute to eliminate income tax avoidance, its application is not, by its terms, dependent upon the parties' motives. Rather, the statute provides a blanket rule "that transfer restrictions generally are to be given no effect in computing the Section 83(a) inclusion." See *Sakol v. Commissioner*, 574 F.2d 694, 699 (2d Cir. 1978), affg. 67 T.C. 986 (1977), cert. denied 439 U.S. 859 (1978). See also *Pledger v. Commissioner*, 71 T.C. 618 (1979), affd. 641 F.2d 287, 291 (5th Cir. 1981). The legislative history of section 83 does not require the conclusion that the statute should be applied to tax-avoidance techniques only. To the contrary, the House and Senate reports specifically delineate transactions and transfers to which section 83 was not to apply and do not exclude from its purview contractual provisions that were not tax motivated. H. Rept. 91–413 (1969), 1969–3 C.B. 255–256; S. Rept. 91–552 (1969), 1969–3 C.B. 500–501. We cannot impute such intent here. Finally, we note that, in a closely related context, other restrictions which are clearly not tax motivated have been found to be within the purview of section 83. See *Horwith v. Commissioner*, 71 T.C. 932, 939–940 (1979); *Pledger v. Commissioner, supra* at 629; *Sakol v. Commissioner, supra* at 997.

A. Section (3)

### 1. Substantial Risk of Forfeiture

With regard to section (3), section 83(c)(1) defines "substantial risk of forfeiture" for purposes of section 83(a) as follows:

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

Section 1.83–3(c)(1), Income Tax Regs., defines it further:

(c) *Substantial risk of forfeiture*—(1) *In general.* For purposes of section 83 and the regulations thereunder, whether a risk of forfeiture is substantial or not depends upon the facts and circumstances. A substantial risk of forfeiture exists where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining

from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied.

Property is not transferred subject to a substantial risk of forfeiture to the extent that the employer is required to pay the fair market value of a portion of such property to the employee upon the return of such property. The risk that the value of property will decline during a certain period of time does not constitute a substantial risk of forfeiture. A nonlapse restriction, standing by itself, will not result in a substantial risk of forfeiture.

Section (3) was not conditioned upon Robinson's performance of services within the meaning of the above-quoted regulation; nor was it related to the purpose of the transfer, which was that Robinson leave Wang and agree to remain with Centronics for 5 years, having a financial interest in the company during that term. The Employment Agreement and section (2)—not section (3)—were the conditions which assured Centronics its purpose for the transfer.

The parties have taken differing positions on whether section (3) is a restriction or a substantial risk of forfeiture or both. Specifically, Centronics argues that a "restriction" cannot also constitute a "risk of forfeiture." We do not find it necessary to resolve this definitional refinement in this context. Clearly, section (3) is a transfer limitation with a defined life of 1 year. Therefore, under paragraphs (h) and (i) of section 1.83–3, Income Tax Regs., if it is a restriction, it would be a lapse restriction. But the regulations make it clear that a lapse restriction may also constitute a restriction carrying a substantial risk of forfeiture.[29]

Our inquiry thus boils down to determination of whether or not section (3) constitutes a substantial, as distinguished from an insubstantial, risk of forfeiture. Applying the "facts and circumstances" test in the manner directed by the regulations,[30] we do not agree with Robinson that section (3) constitutes or creates a "condition related to the purpose of the transfer," as we have pointed out. But even if it were, such

---

[29]Sec. 1.83–3(i), Income Tax Regs., provides:

(i) *Lapse restriction.* For purposes of section 83 and the regulations thereunder, the term "lapse restriction" means a restriction other than a nonlapse restriction as defined in paragraph (h) of this section, and includes (but is not limited to) a restriction that carries a substantial risk of forfeiture.

[30]See sec. 1.83–3(c)(1), Income Tax Regs.

condition would always be satisfied simply by the passage of a relatively short and thus insubstantial period of time—1 year. There is, of course, the economic risk that the value of the Option Stock would decline while waiting for the transfer limitation to expire. But the regulations also tell us that such a risk is insubstantial.[31]

There is here, in our view, a clear parallel to section 16(b) which, as we held in *Horwith*, did not restrict the transferability of stock. The only difference of substance between section 16(b) and section (3) is that the latter lasts 6 months longer. It was intended by Centronics to serve and it does serve a similar purpose. We recognize that the issue of substantial risk of forfeiture was not before us in *Horwith*. But *Horwith* also relies on both *Kolom v. Commissioner*, 71 T.C. 235 (1978), affd. 644 F.2d 1282 (9th Cir. 1981), cert. denied 454 U.S. 1011 (1981); and *Bayley v. Commissioner*, 69 T.C. 234 (1977), affd. 624 F.2d 884 (9th Cir. 1980). See also *Gresham v. Commissioner*, 79 T.C. 322 (1982), on appeal (10th Cir., Jan. 24, 1983). In both *Kolom* and *Bayley* we concluded that section 16(b) did not affect the fair market value of stock. By this analogy we conclude that section (3) did not affect the fair market value of Robinson's stock on the date of its receipt merely because he was required to refrain from disposing of it for 12 months. And in the absence of express congressional intent,[32] we do not believe that a provision which does not affect market value but only restricts sale for a limited period should be classified as a *substantial* risk of forfeiture. Under the particular facts of this case, we hold that the condition imposed in section (3) was not "substantial" within the meaning of the pertinent statutory and regulatory provisions. Thus, the Option Stock was not subject to a substantial risk of forfeiture on March 4, 1974.

## 2. Transferability

The parties also have addressed the issue of whether section (3) prevented the stock's transfer. The evidence appears to be in substantial conflict as to whether in actual fact the stock

---

[31]See sec. 1.83–3(c)(1), Income Tax Regs.

[32]As part of the Economic Recovery Act of 1981, Congress prospectively amended sec. 83(c) so that the existence of a sec. 16(b) restriction made stock both subject to a substantial risk of forfeiture and nontransferable. See note 44 *infra*.

might have been salable or usable as collateral for a loan (and thus transferable within the meaning of section 83(c)(2) and its accompanying regulations[33]). But this conflict is more apparent than real. It reflects the practicalities of the situation as seen by Robinson's experts. Unfortunately for Robinson, we have found no direction by Congress to construe section 83 in the light of the practicalities prevailing in securities markets.

The Legend on Robinson's stock certificate was designed to prevent transfer of unregistered stock under circumstances which would constitute a violation of the Securities Act of 1933 and the Securities and Exchange Commission rules and regulations. The Stop Transfer Order implemented this same purpose, although it did require notification to Centronics of the fact of a requested transfer, a point emphasized by Robinson. But he nowhere suggests that the Legend and the Stop Transfer Order, together or separately (but independently of section (3)), would render the Option Stock nontransferable, or for that matter, subject the Option Stock to a substantial risk of forfeiture. It is understandable that such an argument is not made.

Neither the Legend nor the provisions of the Securities Act of 1933 prevented the sale or pledge of the Option Stock, although absent registration, any sale would have been of the private resale type,[34] substantially reducing value. See, e.g., *Pledger v. Commissioner*, 641 F.2d 287 (5th Cir. 1981), affg. 71

---

[33]Sec. 83(c)(2) provides:

(2) TRANSFERABILITY OF PROPERTY.—The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.

Sec. 1.83–3(d) provides:

(d) *Transferability of property.* For purposes of section 83 and the regulations thereunder, the rights of a person in property are transferable if such person can transfer any interest in the property to any person other than the transferor of the property, but only if the rights in such property of such transferee are not subject to a substantial risk of forfeiture. Accordingly, property is transferable if the person performing the services or receiving the property can sell, assign, or pledge (as collateral for a loan, or as security for the performance of an obligation, or for any other purpose) his interest in the property to any person other than the transferor of such property and if the transferee is not required to give up the property or its value in the event the substantial risk of forfeiture materializes. On the other hand, property is not considered to be transferable merely because the person performing the services or receiving the property may designate a beneficiary to receive the property in the event of his death.

[34]See generally D. Goldwasser, A Guide to Rule 144, sec. 12.07.2 (1975); 3 H. Bloomenthal, Securities and Federal Corporate Law, sec. 4.08[2][b] (1983). Goldwasser on page 437 adverts to Securities and Exchange Commission staff involvement in "no-action" letters concerning foreclosure sales, thus confirming the fact that Securities Act restrictions do not preclude a pledge of the restricted stock as collateral for a loan.

T.C. 618 (1979); *Gresham v. Commissioner, supra*. The fact that a purchaser in a private resale may be subject to the same Securities Act restriction does not mean that the purchaser's ownership is subject to a substantial risk (or any risk) of forfeiture. The effect is only to narrow the potential market and reduce the value of the stock.

Robinson's argument on transferability depends upon the combined effects of the Legend and the Stop Transfer Order in that they would have caused Centronics to be notified of any requested transfer of the Option Stock. Robinson argues that, upon receipt of such notification, Centronics would have undertaken to enforce the provisions of section (3).[35] Thus, it is contended, any transfer would have been blocked, and the Option Stock thereby was rendered nontransferable. Robinson is forced into this building block type argument as a result of the absence of express reference to section (2) or section (3) on the Option Stock certificate.

The transfer of securities, and more particularly the effect of the restrictions on transfer, is governed by the Uniform Commercial Code (U.C.C.)—in this case by title 6, sec. 8–204, and title 8, secs. 201 and 202, of the Delaware Code.[36] The Uniform Stock Transfer Act, which preceded the U.C.C., voided any restriction on transferability which was not noted

---

[35]Centronics argues, based upon Howard's testimony, that Centronics would have waived sec. (3) if requested. This argument is highly speculative and fails, moreover, to address Howard's fiduciary obligation to the corporation and its shareholders.

[36]Del. Code Ann. tit. 6, sec. 8–204 (1974), provides:

§ 8–204. Effect of issuer's restrictions on transfer.

Unless noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge of it.

Del. Code Ann. tit. 8, sec. 201 (1974), provides in pertinent part:

Except as otherwise provided in this chapter, the transfer of stock and the certificates of stock which represent the stock or uncertificated stock shall be governed by Article 8 of subtitle I of Title 6.* * *

Del. Code Ann. tit. 8, sec. 202(a) (1974), provides:

(a) A written restriction on the transfer or registration of transfer of a security of a corporation, if permitted by this section and noted conspicuously on the certificate representing the security or, in the case of uncertificated shares, contained in the notice sent pursuant to subsection (f) of § 151 of this title, may be enforced against the holder of the restricted security or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder. Unless noted conspicuously on the certificate representing the security or, in the case of uncertificated shares, contained in the notice sent pursuant to subsection (f) of § 151 of this title, a restriction, even though permitted by this section, is ineffective except against a person with actual knowledge of the restriction.

on the stock certificate. This rule was relaxed by the U.C.C., as is evident in these provisions of the Delaware Code, in that an unstated restriction is no longer void. However, it is binding only on a person with *actual* knowledge.[37] Thus, as to restrictions imposed by an issuer of stock, a purchaser is in an even more protected position than a bona fide purchaser who is bound not only by actual knowledge but also by facts as to which he has had notice.[38] These statutory rules reflect the legislative policy that a "stockholder has an inherent right to transfer his stock."[39] While a repurchase option such as section (3) is generally valid, it was long ago recognized that it may be invoked against a bona fide purchaser.[40] Under the above-cited provisions of the Delaware Code, we believe it is plain that section (3) would not be binding upon a purchaser without actual knowledge. We must inquire, therefore, whether the existence of the Legend would necessarily cause a transferee to take with knowledge of other restrictions, such as section (3).

On this record, we cannot conclude that every possible purchaser of the Option Stock from Robinson would inevitably acquire knowledge of section (3) before the purchaser became bound. We agree with Robinson that, by reason of the Legend, lawful transfer of the restricted securities could have been made only in an exempt private resale unless the Option Stock were registered. It is also true that a purchaser in a private resale must be an informed person, frequently represented by counsel.[41] Further, the transfer agent, by reason of the Stop Transfer Order, would have communicated to Centronics the fact of receipt of a transfer request. Also, a careful purchaser, or his counsel, might have made an informal inquiry of the transfer agent or of Centronics prior to purchase. Thus, we recognize that a proposed purchaser might in fact have become aware of section (3) during the course of the consummation of purchase of the Option Stock. It is far from certain, however,

---

[37] See, e.g., *Joseph E. Seagram & Sons, Inc. v. Conoco, Inc.*, 519 F. Supp. 506, 514 n. 6 (D. Del. 1981); 1 F. Christy, Transfer of Stock, at 5:4.

[38] See Del. Code Ann. tit. 6, sec. 1–201(25) and secs. 8–301 et seq.

[39] "One of the incidents of the ownership of property is the power to dispose of it at pleasure." 1 F. Christy, *supra* at 5:1.

[40] 1 F. Christy, *supra* at 5:14, 5:22. This rule was made more stringent by the Uniform Stock Transfer Act and the Uniform Commercial Code.

[41] See authorities cited in note 36 *supra*.

that this awareness would necessarily have occurred (as Robinson contends) before such a person became obligated to acquire the stock or that Centronics could have prevented consummation of a sale otherwise legal under securities law.[42] One of Robinson's expert witnesses, in fact, supports our view.

In reaching this conclusion, we do not agree that the concept of transferability under section 83 should turn upon practical considerations as to whether or not a careful purchaser would have acquired actual knowledge of the existence of section (3) before entering into an agreement to acquire Robinson's stock. We must deal with a hypothetical, not an actual or any particular purchaser. See, e.g., *Kolom v. Commissioner*, 71 T.C. at 244. Moreover, transferability must be determined upon the ability of the holder of stock to transfer it to a transferee whose rights in the stock are not subject to a substantial risk of forfeiture. Sec. 1.83–3(d), Income Tax Regs. The fact that a purchaser would be subject to the Securities Act resale restrictions would not make the stock held by the purchaser subject to a substantial risk of forfeiture.[43] A knowledgeable purchaser certainly would have understood the Legend and the resale rules. In that circumstance, such a purchaser might well have bound himself to buy the stock before making any inquiry. This is the type of fact situation that was before us in *Gresham v. Commissioner, supra.*

Petitioners Robinson have failed to demonstrate that a purchaser from Robinson would necessarily have acquired the stock subject to section (3), or that Centronics, in every circumstance, would have had the opportunity to undertake to block a sale or pledge. Hence, we conclude that the Option Stock was transferable within the meaning of section 83(a). See sec. 1.83–1(f), example (2), Income Tax Regs.

## B. Section 16(b)

Robinson's alternate argument is that section 16(b) subjected the stock to a "substantial risk of forfeiture" and

---

[42]Centronics obviously had the privilege and the opportunity to broaden the Legend on Robinson's certificate to include adequate reference to the Option Agreement. Why it chose not to do so, we do not know. Inevitably, Centronics ran the risk that a transferee for value might acquire the Option Stock free of the repurchase option. In these circumstances, an estoppel argument might properly be made against Centronics. 1 F. Christy, *supra* at 5:14.

[43]We should note, however, that our conclusion in part A.1. of this section of our opinion that in Robinson's hands sec. (3) did not make the stock subject to a substantial risk of forfeiture may not apply to a purchaser taking with actual knowledge of sec. (3). We express no opinion as to that.

rendered it "nontransferable" within the meaning of section 83. In *Horwith v. Commissioner*, 71 T.C. 932, 940–941 (1979), we addressed the transferability issue and held that section 16(b) "does not restrict the transferability of shares of stock but rather provides for the regurgitation of profits from 'insider trading.'" 71 T.C. at 940. In *Horwith*, since the taxpayer could have sold the stock at issue, we held that it was transferable. *Horwith* is dispositive of the same issue in this case. Hence, we need not address the question of whether section 16(b) also created a "substantial risk of forfeiture" under section 83. Robinson's argument on section 16(b) is without merit.[44]

III. CONCLUSION

For the foregoing reasons, we hold that petitioners Robinson must include in income for their 1974 calendar year the difference between the value of the Option Stock on March 4, 1974, and the price paid for it. As stipulated by Centronics and respondent, Centronics is entitled to a deduction in its taxable year ending June 30, 1974, in the amount ultimately determined to be includable in gross income by the Robinsons.

*Appropriate orders will be entered.*

---

[44]We note that sec. 83(c)(3) provides:

(3) SALES WHICH MAY GIVE RISE TO SUIT UNDER SECTION 16(B) OF THE SECURITIES EXCHANGE ACT OF 1934.—So long as the sale of property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934, such person's rights in such property are—
    (A) subject to a substantial risk of forfeiture, and
    (B) not transferable.

This provision, which was added by sec. 252(a) of Pub. L. 97–34, 95 Stat. 260, Aug. 13, 1981, was made effective to transfers after Dec. 31, 1981. (Sec. 252(c) of Pub. L. 97–34, 95 Stat. 260, as amended by sec. 102(k)(2) of Pub. L. 97–448, 96 Stat. 2374, and sec. 109 of Pub. L. 97–448, 96 Stat. 2391, Jan. 12, 1983.) Thus, this provision has no bearing on this case. See, e.g., 1 J. Mertens, Law of Federal Income Taxation, sec. 3.33, at 72 (1981 rev.).