DAVID A. KOSS AND FREYA B. KOSS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Koss v. Commissioner
Docket No. 4001-81
United States Tax Court
T.C. Memo 1989-330; 1989 Tax Ct. Memo LEXIS 328; 57 T.C.M. (CCH) 882; T.C.M. (RIA) 89330; July 11, 1989
David A. Koss, pro se. James P. Clancy, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1972 and 1974 in the amounts of $ 26,009 and $ 48,788.05, respectively. After concessions, the issues for decision are: (1) Whether petitioner David Koss *330 entered into a "joint venture" with Lester Wolser relating to the liquidation of their interests in the Dynetics Corporation or entered into an agreement for performance of legal services; (2) Whether the amount of $ 109,568 petitioner David Koss received from Lester Wolser in 1972 was ordinary income for legal services rendered or capital gains from the sale or exchange of capital assets; and (3) Whether $ 110,000 worth of Video Systems Corporation stock received by petitioner David Koss during the taxable year 1974 was includable in gross income as ordinary income that year pursuant to section 83(a) [1] or was nontransferable or subject to a substantial risk of forfeiture pursuant to section 83(c) so as not to be includable that year. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties' stipulations of fact and exhibits attached thereto are incorporated herein by this reference. Petitioners David A. *331 Koss and Freya B. Koss, husband and wife, resided at 519 Sussex Road, Wynnewood, Pennsylvania at the time of the filing of the petition. David A. Koss (hereinafter referred to as "petitioner") has been a lawyer licensed to practice in the Commonwealth of Pennsylvania since 1957. Lester E. Wolser (hereinafter referred to as "Wolser") of Philadelphia, Pennsylvania was a co-founder and principal shareholder of both Dynetics Corporation and Video Systems Corporation. In 1968 Wolser founded the Video Systems Corporation, and he purchased another company as a "shell," changed its name, and transformed the company into Dynetics Corporation. The Dynetics Corporation grew from a company that owned two food stores and a defunct bayonnet factory to a company whose sales were close to $ 30 million a year. Much of the growth came from acquisitions of companies that became subsidiaries of Dynetics. Wolser and Charles Cascio (hereinafter referred to as "Cascio"), the other co-founder and principal shareholder, were operating officers of those two companies. As principals, they were not 51-percent shareholders but were controlling shareholders. Wolser, for example, held approximately 19 percent *332 of the outstanding voting common stock of Dynetics Corporation. In 1969 petitioner was hired as house counsel for Dynetics Corporation and Video Systems Corporation and as an inducement was issued 100,000 shares of stock in the Dynetics Corporation and a small block of stock, around 5,000 shares, in the Video Systems Corporation. Petitioner also served at times as a corporate officer and director of both corporations. In February of 1971, Wolser became the president and chief operating officer of Dynetics Corporation. Cascio was president and chief operating officer of Video Systems Corporation. Since both companies were active ongoing businesses, most of Wolser's time was devoted to Dynetics Corporation, while Cascio's time was spent with the Video Systems Corporation. Wolser received a salary from both corporations, until he resigned as a director of Video Systems Corporation in December 1971 and then resigned from the Dynetics Corporation in January 1972. In 1971, Wolser received $ 36,000 per year as compensation from Video Systems and $ 42,000 per year from Dynetics Corporation. In mid-1970 through the beginning of 1971, the directors of the Dynetics Corporation found *333 themselves in the midst of constant disagreement and bickering. The problem apparently was precipitated by a one-million dollar inventory shortage in one of Dynetics' subsidiary corporations. The major participants in the fighting were the two principal shareholders and co-founders, Wolser and Cascio. Between February 1971 and December 1971 there was tremendous friction as a result of serious differences on the board of directors between the Wolser faction and the Cascio faction about the management procedures and policies of the Dynetics Corporation. By about mid-1971, the five board members were Wolser, Cascio, petitioner, Alan Alpern (hereinafter referred to as "Alpern"), and Frank Cooley (hereinafter referred to as "Cooley"). Finally, in December 1971, the relationship between Wolser and Cascio ruptured completely. Wolser thereafter disassociated himself from all business affiliations with Cascio. For over a year, petitioner, as the corporate legal counsel, had attempted without success to mediate the disputes between these two factions at the Dynetics Corporation and had been paid handsomely for his efforts. In October 1971, Alpern had been threatened with bodily harm *334 if he did not align himself with the Cascio faction. Wolser and petitioner also were subjected to telephone threats of bodily harm as were their families. Initially, Wolser reported the threats to the Federal Bureau of Investigation (FBI), but the FBI told Wolser nothing could be done since he could not identify the caller. Approximately six months of harassing and threatening telephone calls persisted until finally Wolser received a call warning him to "see what happens to Alan [Alpern] tomorrow." Later in October 1971 Alpern was physically harmed by unknown individuals and had to be hospitalized for those injuries. Unknown individuals had poured gasoline on Alpern, lit the substance, and had run off. Upon learning about the Alpern incident, petitioner and Wolser rushed to New York to see Alpern and to discuss what alternatives were available to them, since together they represented three-fifths of the board of directors. The other two directors were Cascio and Cooley, who had become president of a subsidiary of Dynetics Corporation in May 1971. Several weeks later in November 1971, Wolser, petitioner, and Alpern again met and decided that the three of them would attempt *335 to sell their interests in the Dynetics Corporation to the Cascio faction. Since Wolser, Alpern, and petitioner represented three-fifths of the board of directors, they made an oral agreement whereby all their interests would be sold together, rather than on an individual-by-individual basis. They thought that collectively the three of them would have greater leverage to negotiate the sale of their interests. If an agreement was entered into with just one of them, the three men reasoned that the board of directors and the corporation could then ignore the other two directors because the acquiring shareholders would control the corporation, particularly since Cooley was already the largest individual shareholder of Dynetics Corporation. As a result of the meeting of these three directors, petitioner, because of his legal expertise, was asked by Wolser and Alpern to meet with Cooley to attempt to negotiate a buy out of all three individuals' interests in the Dynetics Corporation stock. Petitioner traveled to Boston on December 13, 1971, met with Cooley, made a deal, came back from Boston, and reported to Wolser that he had entered into an agreement with Cooley. However, instead *336 of the orally agreed-upon arrangement among the three directors for a sale of all of their stock, petitioner had negotiated the sale of only his own stock in the Dynetics Corporation. He had negotiated with Cooley the sale of his 100,000 shares of Dynetics Corporation stock at a price of $ 1.50 per share. The settlement on that sale was to take place on January 3, 1972. The next day after his Boston trip, on December 14, 1971, petitioner informed Wolser and Alpern that he had sold his 100,000 shares for $ 1.50 per share or $ 150,000. After finding out what had happened, Wolser and Alpern were outraged and felt betrayed, since petitioner was supposed to represent the interests of the three of them together. However, petitioner had had debts to pay, i.e., he owed Continental Bank $ 85,000. Thus, in the end, he made a deal with Cooley, whereby he (petitioner) was left with a net of $ 65,000 from his stock sale agreement. Even though he had consummated a deal only for himself, petitioner told Wolser that he felt certain that Cooley "would make the same deal with you [Wolser] that he did with me [petitioner]." Wolser told petitioner that he (petitioner) had put Alpern and himself *337 in a precarious situation, since Cooley now had control of the Dynetics Corporation, and Wolser thought it unlikely Cooley would enter into the same agreement with him and Alpern. After having learned that petitioner had negotiated a buy out only for himself, Wolser felt that Alpern should be apprised of any future discussions as well as any agreement he (Wolser) might enter into with Cooley through petitioner. Wolser did not want to betray Alpern. Meanwhile, Alpern had decided and informed both Wolser and petitioner that he did not intend to sell his shares nor did he desire to enter into any negotiations with Cooley at that time. On December 17, 1971, Wolser himself entered into negotiations with Cooley and reached an agreement for the sale of his Dynetics stock. Under that agreement, Wolser would have an option right to sell either 75,000 shares of Dynetics or his entire 150,000 shares of Dynetics at $ 1.50 per share. That agreement, however, contained numerous contingencies and warranties so that it was highly uncertain as to whether or not the contract would ever be carried out. The settlement was to take place on April 28, 1972, some four months later. During the first *338 week of January 1972, petitioner placed telephone calls to Cooley and Richard Dearborn, Cooley's attorney, in Massachusetts. Petitioner urged those individuals to go through with the purchase of Wolser's stock, not on April 28, 1972, but much sooner. Petitioner felt there was no reason for them not to buy Wolser out, since they wanted harmony at Dynetics, and harmony would not exist at Dynetics if Wolser retained any shares in Dynetics. Petitioner also made an offer of "good faith" to Wolser, that is, he would lend him half of the net of $ 65,000, or $ 32,500, that petitioner had accepted in his agreement with Cooley, since petitioner felt certain Cooley would enter into a similar agreement with Wolser as he had made with petitioner. Wolser and petitioner entered into an oral arrangement, whereby once Wolser had consummated a similar deal with Cooley, the $ 32,500 would be returned to petitioner by Wolser. On the other hand, if Cooley did not make a similar deal with Wolser, Wolser would be allowed to transfer to petitioner 21,667 shares of Dynetics stock at $ 1.50 per share or $ 32,500. In effect, petitioner would buy 21,667 shares of Wolser's Dynetics stock for $ 32,500. Wolser *339 accepted the proposal. However, Wolser made a deal with Cooley on January 26, 1972, and thus Wolser ultimately returned the $ 32,500 to petitioner. Soon after December 17, 1971, but prior to December 30, 1971, Wolser and petitioner met in the offices of Dynetics Corporation to discuss petitioner's legal relationship with Wolser on an ongoing basis. During this period, petitioner told Wolser that he wanted to get out of his private practice of law and to become further involved as counsel in the area of stocks and investments, such as Dynetics Corporation. Wolser gave petitioner the option of becoming involved in different investment opportunities as Wolser's counsel. For example, if Wolser were to purchase a company, Wolser wanted petitioner not necessarily to negotiate the sales price, but to perform the legal work involved on any legal documents, any employment contracts, any lease arrangements, or any other necessary documents. Wolser wanted a working arrangement between petitioner and himself for all of the potential legal situations, but he did not want to commit himself to a specific dollar fee, because he did not know how much legal work would be involved. If petitioner *340 chose to accept his offer, Wolser agreed to compensate him with the proceeds of 50,000 shares of some 230,000 shares of Video Systems stock Wolser owned. There was, however, no written agreement between Wolser and petitioner. Based on the total number of shares that Wolser owned in Video Systems, petitioner's percentage would be about 22 percent. The other part of the oral agreement was the Dynetics Corporation deal mentioned above, i.e., that if the Cooley agreement were consummated, Wolser would return the $ 32,500 to petitioner. Wolser suggested that if petitioner could persuade Cooley to go through with the Dynetics stock purchase agreement, a partnership possibility could be in the offing between Wolser and petitioner for investment opportunities and other business arrangements. Between December 17, 1971 and December 30, 1971, petitioner was informed that Cooley was not going through with the purchase of Wolser's stock. Despite the contract Wolser had with Cooley, there were so many contingencies in that agreement that the stock sale was unlikely to be consummated. Cooley had already refused to put up the letter of credit, which the contract called for. Also Wolser had *341 a debt obligation to the Continental Bank located in Philadelphia of approximately $ 180,000 for which his Dynetics Corporation stock was held as collateral. The Dynetics Corporation had purchased a company, O.B. Dyers, Inc., located in Reading, Pennsylvania, but Dynetics had to borrow approximately $ 2.5 million from the Continental Bank to finance the acquisition. Continental Bank had required that Cascio and Wolser, as the two principal shareholders, personally guarantee part of the loan, a common practice for bank loans to small companies. Continental Bank had knowledge of the hostility between Wolser and Cascio, the two rival factions, so when Wolser and Cascio and Continental Bank entered into a loan arrangement and subsequent agreement in November 1971, Continental Bank had required the two principal shareholders to guarantee the loan as individuals for $ 182,500. Each individual was responsible for half the loan, or $ 91,250. In addition to the $ 91,250 personal guarantee, Wolser owed the bank for money he borrowed to purchase a Dynetics debenture and to lend to an individual named Lou Conetta. In other words, Wolser had personal loans with the bank as well as being a *342 guarantor on Dynetics' corporate loans and loans for other investments. [2]
After learning that Cooley would not carry out his contract with Wolser or enter into negotiations with Wolser for Wolser's shares of Dynetics Corporation stock because of Wolser's debt obligations, petitioner prepared a memorandum in regard to the Wolser/petitioner discussions held earlier in December. This handwritten memorandum is undated and was not signed or initialed *343 by either Wolser or petitioner. Petitioner claims that this memorandum reflects the essence of a partnership agreement with Wolser whereby petitioner would receive one-half of everything that Wolser had in Dynetics, i.e., one-half of 150,000 shares of Dynetics stock, a debenture in the amount of approximately $ 65,000, and his employment contract, if petitioner could persuade Cooley to go through with the Dynetics stock purchase agreement. According to petitioner, Wolser's offer was contingent upon petitioner's contributing to the partnership both his employment contract and the proceeds from the sale of his Dynetics stock to Cooley, which sale was going to close on January 3, 1972. Petitioner claims that this Dynetics "partnership" is separate and apart from any arrangement for legal services in regard to Wolser's Video Systems stock; Wolser contends that there was no joint venture or partnership and that their oral agreement was for petitioner to render legal services in regard to both the Dynetics and Video Systems stock. Petitioner's memorandum contains figures indicating Wolser owned 179,134 shares of Dynetics Corporation common stock on December 30, 1971. Under the figure *344 of 179,134 is a designation of H-36, which are shares of stock that Wolser apparently had to turn over to a John Hartman, an associate of Cascio's and Wolser's in the Video Systems Corporation, thus leaving Wolser with approximately 142,000 shares of stock in Dynetics. [3] The first paragraph of petitioner's memorandum reads: "DAK [petitioner] to transfer to LEW [Wolser] $ 32,500 -- return to DAK, if DAK makes Frank Cooley buy out LEW." [4] The record does establish that Wolser agreed that if petitioner were successful in persuading Cooley to go through with the contract with Wolser, petitioner would be repaid the $ 32,500. *345 Paragraph 2 of petitioner's memorandum states: "On April 30 or when LEW [Wolser] closes with Frank Cooley, LEW [Wolser] to give DAK [petitioner] 1/2 of net proceeds after payments by Wolser to Continental Bank of max of $ 86,000. * * *." The paragraph further indicates that Wolser will also transfer and assign a one-half interest in the Dynetics debenture in the amount of $ 63,333 to petitioner and will agree to discount that debenture at a bank on April 30th, if acceptable to the bank. That particular debenture was not covered in the written contract which Wolser had with Cooley. The third paragraph of petitioner's memorandum states that Wolser "agree[s] to sell all notwithstanding agreement of Cooley & Wolser to sell only 75,000 shares." However, Wolser, under his written agreement of December 17 with Cooley, could sell 75,000 shares or all 150,000 shares of his Dynetics stock at his option. Petitioner insisted that if he could renegotiate with Cooley, Wolser should sell all of his stock, not just 75,000 shares. According to Wolser, the $ 32,500 payment, contrary to petitioner's view, was not a contribution to a joint venture or a partnership, but instead was a loan, *346 if Wolser made his deal with Cooley, which in turn was contingent upon petitioner's ability to negotiate with Cooley. In the alternative, if Wolser did not consummate his deal with Cooley, Wolser regarded the $ 32,500 as a sale to petitioner of Dynetics Corporation stock. As Wolser understood his oral agreement with petitioner, there were two alternatives. The $ 32,500 was a loan if Wolser made the sale to Cooley, or it was a sale to petitioner of Dynetics stock if Wolser did not make his sale to Cooley. If the latter situation were to result, then petitioner would have purchased 21,667 shares of Wolser's Dynetics stock at $ 1.50 per share. In late December 1971 and January 11, 1972, petitioner gave Wolser checks totaling $ 32,500 as they had agreed. During the last week of December 1971 and up to January 26, 1972, petitioner acted as legal counsel for Wolser, performing such duties as negotiating with the Continental Bank to release Wolser from his personal guarantee of $ 2.5 million, obtaining a release from a personal guarantee from the Bank of Western Pennsylvania in Pittsburgh, preparing lawsuits against Cascio on matters relating to Video and other matters unrelated to Video, *347 as well as negotiating settlements of Wolser's employment contracts with both Video Systems and the Dynetics Corporation. For instance, on December 31, 1971, petitioner called Donald Hinkle, vice president of Continental Bank, and asked him not to foreclose on Wolser's Dynetics Corporation stock. Petitioner asked Hinkle to give Wolser additional time to liquidate his debt, because petitioner felt and Wolser agreed that petitioner might be able to persuade Cooley to go through with the purchase of Wolser's Dynetics stock and debenture and with a settlement of his employment contract within a short period of time. As a result of petitioner's efforts, Continental Bank did not foreclose on the Dynetics stock. In addition to those legal services mentioned above, petitioner in January 1972 provided legal assistance on the $ 12,000 note that Wolser delivered to Continental Bank. See n.2, supra. He persuaded Continental Bank to accept the note and thereby release Wolser from any further obligation on an indebtedness he had incurred in regard to the Fiberdyne Corporation. On the day of Wolser's Dynetics settlement, January 26, 1972, Wolser received two Dynetics notes -- one for $ *348 12,500 and the other for $ 12,000. Subsequently, Wolser turned over the Dynetics Corporation promissory note in the amount of $ 12,500 to Jack Hartman. These two notes represented the $ 24,500 settlement petitioner had negotiated in regard to Wolser's employment contract with Dynetics. Up to January 26, 1972, Wolser continued to have an ownership interest in the Dynetics Corporation. The Dynetics Corporation proxy statement and notice of annual meeting held on June 28, 1972, made no reference to any joint venture between petitioner and Wolser, yet any such arrangement between two principal stockholders of the corporation should have been included in those materials. Failure to inform the stockholders of this public corporation of the existence of any such arrangement would have been improper. On January 26, 1972, Wolser, Cascio, Cooley, petitioner, Hinkle, and a Mr. Lepanto (hereinafter referred to as "Lepanto"), who represented the interests of the Dynetics Corporation, attended Wolser's Dynetics Corporation settlement at the Continental Bank in Philadelphia. Despite enlisting petitioner as his counsel, Wolser himself renegotiated the contract with Cooley for the purchase *349 of all of his ownership rights and interests in Dynetics Corporation. At the closing on January 26, 1972, Wolser received $ 225,000 from Cooley for all of his 150,000 shares of Dynetics stock. In addition, the Dynetics Corporation paid Wolser approximately $ 65,000 to liquidate Dynetics' obligation to Wolser on the Dynetics Corporation debenture. Wolser also was paid $ 24,500 on his Dynetics employment contract. As a result of that settlement, Wolser cleared approximately $ 120,000 net, after the payment of his obligations. On January 26, 1972, Wolser's relationship and involvement in Dynetics Corporation ended. After Wolser sold his Dynetics Corporation stock, Wolser paid petitioner approximately $ 110,000 for his legal services. Specifically, in 1972 Wolser paid petitioner $ 109,568 consisting of cash payments totaling $ 70,609 and $ 38,959 in payments Wolser made to third parties on petitioner's behalf. Petitioner did not report the $ 109,568 as ordinary income in 1972; instead, petitioner reported $ 109,500 as a sale of 73,000 shares of Dynetics stock at $ 1.50 a share. Petitioner now characterizes the $ 109,568 payment as his one-half of a joint venture with Wolser; Wolser *350 characterizes it as a payment for legal services rendered. In December of 1971, Wolser had also told petitioner that he would pay him the proceeds of 50,000 shares of Video Systems stock or transfer 50,000 shares of Video Systems stock to him for his legal fee for working on his (Wolser's) Dynetics and Video Systems problems. Paragraph 4 of petitioner's unsigned and undated memorandum, discussed above, states as follows: Wolser will transfer to Koss 50,000 shares of Video stock, 25,000 of which are in your possession, and 25,000 of which are pledged at bank. If Dynetics deal not closed, LEW [Wolser] will give Koss 75,000 shares. Petitioner and Wolser did not agree, orally or otherwise, to any arrangement in regard to 75,000 shares of Video Systems stock. The above-quoted terms are at most a suggestion put forward by petitioner, which Wolser never accepted or agreed to. Later, in February 1972, petitioner and Wolser continued their attorney-employer relationship, set up offices together, and incorporated Capital Concepts Corporation, with 50 percent of the shares owned by petitioner and 50 percent owned by Wolser. As the operating officers of this particular company, *351 both Wolser and petitioner were approached about once a week by various companies trying to interest them in investments. Petitioner and Wolser were advertising themselves (or their corporation) as interested in potential financial enterprises that they could build and help to grow and to which they could provide their investment expertise. Such prospective business ventures generated a lot of travel expenses that were paid by Capital Concepts Corporation. Besides becoming active principals in the Capital Concepts Corporation, petitioner and Wolser continued to negotiate with various interested parties for the sale of Wolser's Video Systems stock. During March 1972, petitioner persuaded Cascio to agree to purchase Wolser's Video Systems stock at $ 2.17 per share. However, Wolser would not accept the offer, because in the meantime the stock had jumped in the over-the-counter market from approximately $ 3.75 to approximately $ 6 per share. Wolser had earlier expressed his intent to sell the Video Systems stock for $ 2 or better per share. Since Wolser did not have unrestricted or freely trading stock, petitioner still attempted to persuade Wolser to sell his stock to Cascio, but *352 Wolser would not do so. Petitioner also prepared a number of legal documents throughout 1972 in regard to Wolser's Video Systems Corporation stock. These documents included a request for a "no-action" letter from the Securities and Exchange Commission (SEC), [5] other correspondence with the SEC, and finally a legal opinion letter prepared by petitioner (hereinafter referred to as "the legal opinion letter"), stating that Wolser could properly sell his Video Systems stock without a stock registration and without being in violation of the securities laws. Those legal documents pertained to all or part of Wolser's 230,500 shares of common stock of Video Systems Corporation. Petitioner initially provided legal assistance to Wolser on his 230,500 shares of Video Systems stock by requesting the SEC to issue a "no-action" letter covering the entire block of shares. The initial application for a "no-action" letter was an application to sell all of Wolser's 230,500 shares of unregistered Video Systems Corporation stock without registration. However, the SEC subsequently decided it would not consider petitioner's request for a "no-action" letter for Wolser's stock, if the application covered *353 more than 36,000 shares, later reduced again to 30,000 shares. On July 17, 1972, the request for a "no-action" letter was amended, and then was approved by SEC, thus allowing Wolser to freely trade a total of 30,000 shares in the public market. In 1972 Wolser sold various blocks of Video Systems stock, some in private transactions under SEC Rule 144 and some in public sales under the "no-action" letter. On July 26, 1972, Wolser sold, under SEC Rule 144, 31,250 shares to Jack Hartman for $ 125,000. Pursuant to his oral agreement with petitioner, Wolser gave petitioner a check for $ 27,500, which was equal to 22 percent of that total. [6] In 1972, Wolser sold a total of 68,250 to 70,000 shares. This total included the shares sold to Hartman, 12,000 other shares *354 sold under SEC Rule 144, and at least 5,000 shares sold under the "no-action" letter. Wolser kept an accounting under the terms of his oral agreement with petitioner, recording on a regular basis the 22 percent that petitioner was supposed to receive as payment for his legal services. Wolser maintained the accounting record not only in 1972, but subsequently, at least up to July 1973 when a rift developed between petitioner and Wolser. In October 1972, the SEC revoked its "no-action" letter. Because Wolser had previously sold Video Systems stock in private transactions under SEC Rule 144, the SEC determined that he had no right to sell the "no-action" stock. However, Wolser had sold some stock under the "no-action" letter before he received the notification of revocation. Still, petitioner thought Wolser could sell the "no-action" stock because he believed Wolser had not violated *355 the rules of the SEC. Petitioner wrote a letter to the Deputy Chief Counsel of the SEC, protesting the revocation of the "no-action" letter, but to no avail. At the beginning of 1972, Wolser had 230,500 total shares of Video Systems stock, and he sold about 70,000 shares during 1972. Thus, by the end of 1972, Wolser still had about 160,000 shares remaining unsold. Of some 160,000 shares of unregistered Video stock Wolser still owned, some 75,000 were covered by an option to Cascio. On July 26, 1972, Wolser had executed an option in favor of Cascio, whereby the option gave Cascio the right to buy from Wolser 75,000 shares of stock under certain conditions. Those conditions permitted Cascio to exercise those options for 75,000 shares up until July 31, 1974, but in diminishing quantities over that time period. [7] Thus under that option the 75,000 shares would decrease by 18,750 shares by January 31, 1973. Apart from the shares covered by Cascio's option, Wolser still had 85,750 shares he wished to sell. *356 Having unsuccessfully attempted the SEC Rule 144 route and the "no-action" letter route to sell Wolser's stock, petitioner decided to issue his own legal opinion letter. After extensive research and study of the legal issues, petitioner issued to Wolser a legal opinion letter, dated December 1, 1972. Petitioner's legal opinion letter was to the effect that, despite the fact that Wolser was a "control" person in view of his stock ownership, he was excluded by the Cascio faction from management and therefore, petitioner thought, Wolser could legally sell his remaining 85,750 shares without a stock registration and without being in violation of the securities laws. Petitioner then undertook to persuade Video Systems Corporation to accept his legal opinion letter as a basis for Wolser to sell those shares. He was successful. Video Systems Corporation was willing to accept his legal opinion letter and entered into a letter agreement with Wolser in reliance thereon. On January 23, 1973, Wolser entered into a letter agreement with Video Systems Corporation for the sale to the public of 85,750 of the remaining unregistered shares of Video Systems stock still owned by him. Pursuant *357 to that letter agreement, Video Systems Corporation instructed its transfer agent, Irving Trust Company, on the procedures to be followed for the sale of Wolser's 85,750 shares of Video stock to the public. Initially, the oral agreement between Wolser and petitioner in regard to the latter's compensation specified the number of shares he would receive (proceeds of 50,000 shares), as opposed to a dollar amount he would be paid. In mid-1973, a dispute arose between Wolser and petitioner over the amount petitioner should be paid for his services in regard to the sale of the Video Systems stock. By June and July 1973, petitioner requested Wolser to amend their oral agreement to give him additional proceeds from additional shares, an increase from 50,000 to 60,000 shares of Video Systems stock. At the time petitioner suggested the increase, the value per share had risen substantially. Since Video Systems Corporation accepted petitioner's legal opinion letter and since Wolser's January 1973 agreement with Video Systems Corporation was made possible because of that legal opinion letter, petitioner insisted upon more money from Wolser. However, Wolser told petitioner that they had made *358 a fair deal, especially since petitioner was already making a lot of money on the transaction. Some time later in July 1973, Wolser was approached by Cascio, petitioner, and Lepanto. They explained to Wolser that there were certain obligations by Video Systems Corporation to certain employees of the company. Cascio felt that both he and Wolser were obligated to honor their commitments to those employees, who were with Wolser and Cascio when they founded the company, and to split the responsibility 50/50 because each had founded the company. Wolser agreed and subsequently turned over approximately half of the 37,500 shares (18,750) that were to be distributed to a listed number of employees. Those shares were part of the stock optioned to Cascio as to which the option had expired. Petitioner apparently was furious with Wolser for agreeing to turn over the shares for the company employees. He told Wolser that under no circumstances could Wolser accept Cascio's interpretation without suffering severe repercussions under the securities laws. Petitioner also threatened to revoke his legal opinion letter under which Wolser was still selling part of the 85,750 block of Video shares. *359 On July 30, 1973, further discussions ensued between petitioner and Wolser. Petitioner again demanded more of the stock proceeds. Wolser refused to increase petitioner's fee. Later, on the same day, Wolser left the office briefly, only to find upon his return that the stock certificates for 63,850 shares were missing from the office. Petitioner had taken them. From that time forward, petitioner did not serve as Wolser's attorney and performed no further legal services for Wolser. On or about July 31, 1973, petitioner placed an attorney's lien on the 63,850 shares of Video Systems Corporation stock that he had taken from Wolser's office. These shares were covered by petitioner's legal opinion letter of December 1, 1972, and were not part of the 75,000 originally covered by Cascio's option (whether freed or still under that option). Thereafter, on August 24, 1973, Wolser sued petitioner in the Court of Common Pleas of Philadelphia, Pennsylvania during the August Term, 1973. Wolser sued him for wrongfully and illegally taking possession and converting 60,850 (sic) shares of Video Systems Corporation common stock registered in Wolser's name and belonging to Wolser. The parties *360 to that litigation settled the case, and the Court of Common Pleas in January 1974 adopted their stipulation of settlement in its final decree, retaining jurisdiction only to enforce the terms of their agreed settlement. Pursuant to the terms of their settlement, Wolser transferred to petitioner 22,000 shares of Video Systems stock on February 1, 1974. [8] The fair market value of the stock was $ 5 per share or $ 110,000. [9]
*361 As petitioner perceived the settlement agreement and decree of the Common Pleas Court, he considered that he had a duty to make sure Wolser continued to sell the shares still subject to his legal opinion letter in accordance with the terms of Wolser's agreement of January 23, 1973, with Video Systems Corporation. In other words, petitioner felt he had some sort of obligation to monitor the sale of the balance of the 85,750 shares covered by his legal opinion letter. Under his agreement with Video Systems Corporation, Wolser could not sell more than 6,000 shares in any calendar month and he could not sell more than 300 shares on any one day. At that point there were approximately 63,850 shares of Video Stock still to be sold under petitioner's legal opinion letter. Between February 1, 1974 and October 7, 1975, petitioner regarded himself as monitoring Wolser's sale of Video Systems Corporation stock shares. All that he actually did was release the appropriate number of shares to Wolser's broker and the corporate transfer agent as the shares were sold. Wolser's broker and the corporate transfer agent performed whatever "monitoring" services were necessary. Petitioner was not *362 performing any legal services as an attorney for Wolser, for Wolser's broker, for the corporate transfer agent, or for Video Systems Corporation. To the extent that petitioner performed any legal services in regard to the 63,850 shares of Video stock, he did so on his own behalf. Under the settlement agreement approved by the Court of Common Pleas, petitioner was to receive, in addition to the 22,000 shares transferred on February 1, 1974, the proceeds from the sale of an additional 20,000 shares of this 63,850 shares of Video stock. The proceeds petitioner received from the sale of the 20,000 shares are not involved in this case. The 22,000 shares of Video stock transferred to petitioner in 1974 were still held by him at the time of the trial of this case. The last sale of Video Systems Corporation stock subject to petitioner's legal opinion letter occurred on October 7, 1975, and the last such shares were delivered on October 20, 1975. For the taxable year 1972, Wolser's income was about $ 500,000 but he owed tax of only some $ 5,000 before the minimum tax. When petitioner initially filled out his own individual tax return for 1972, it showed a substantial tax liability, some *363 $ 30,000. He approached Wolser, suggesting that Wolser allow him to report as capital gain the $ 109,568 that he had received as legal fees, i.e., as a stock sale rather than as ordinary income for services rendered, since Wolser's tax return had only $ 5,000 in taxes due. Petitioner explained to Wolser that if he (Wolser) treated the money as an ordinary and necessary business expense deduction for legal fees of $ 109,568, instead of a reduction of capital gains, Wolser's taxes would be reduced very little. As a favor to petitioner, Wolser told petitioner he could report the money Wolser paid to him as the sale by petitioner of the Dynetics Corporation shares, so he could avoid payment of taxes on ordinary income for legal fees. Because of the revocation of the "no-action" letter in regard to Video Systems stock and since most of Wolser's Dynetics Corporation stock sales had been in private transactions, petitioner suggested they take the number of Dynetics shares, which multiplied by $ 1.50 would equal the $ 109,568 (73,000 shares x $ 1.50 = $ 109,500) paid to petitioner as legal fees, and simply adjust their respective Dynetics Corporation transactions on their respective tax *364 returns. This is what petitioner and Wolser did. Thus, on his 1972 return petitioner did not report $ 109,568 in ordinary income for performance of legal services. Instead petitioner reported $ 109,500 as capital gain from a sale of 73,000 shares of Dynetics stock (stock registered in the name of and owned by Wolser). Wolser reported on his 1972 return the sale of 73,000 fewer shares of Dynetics stock than he actually sold. On his 1974 return petitioner did not report any income in regard to the 22,000 shares of Video stock transferred to him on February 1, 1974. Petitioner's position as to the transfer of the 22,000 shares is that he need not report the income therefrom in 1974. He alleges that under section 83(a) and 83(c) these shares were nontransferable and there was a substantial risk of forfeiture until 1975, a year not before this Court. Respondent contends that petitioner should have reported the income in 1974, that the shares were transferable and not subject to any substantial risk of forfeiture that year. OPINION The first issue is whether petitioner, under his oral agreement with Wolser, [10] entered into a partnership/joint venture with Wolser to dispose of *365 all of their interests in Dynetics Corporation, or entered into an arrangement for performance of legal services in regard to Wolser's Dynetics and Video Systems stock. Section 761(a) defines a partnership to include any syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate. * * * Thus, by statutory definition, a joint venture is a form of partnership for Federal tax purposes. It is well established that the basic principles that apply in determining the existence of a partnership apply as well in determining the existence of a joint venture, and it is a factual determination to be made upon the basis of all the facts and circumstances of the particular case. Estate of Smith v. Commissioner, 313 F.2d 724, 728 (8th Cir. 1963), affg. on this issue 33 T.C. 465 (1959); Cleveland v. Commissioner, 297 F.2d 169, 172 (4th Cir. 1961), *366 affg. on this issue 34 T.C. 517 (1960); Beck Chemical Equipment Corp. v. Commissioner, 27 T.C. 840 (1957). The landmark cases as to what constitutes a valid partnership for Federal income tax purposes are Commissioner v. Culbertson, 337 U.S. 733 (1949) and Commissioner v. Tower, 327 U.S. 280 (1946). In Commissioner v. Tower, the Supreme Court held that a partnership had not been established, stating: When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention in this respect is a question of fact, to be determined from testimony disclosed by their "agreement, considered as a whole, and by their conduct in execution of its provisions." * * * [327 U.S. at 286-287.] The Supreme Court in Commissioner v. Culbertson reiterated the Tower "intention" test, which is to be determined by: all the facts -- the agreement, the conduct of the parties in execution of its provisions, their *367 statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent -- the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * * Triers of fact are constantly called upon to determine the intent with which a person acted. * * * [Fn. ref. omitted. 337 U.S. at 742-743.] State of mind has always been determinative of the question whether a partnership has been formed between the parties. Of course, the determination of state of mind is based on all of the facts and circumstances of the particular case, and more weight is given to objective factors than to a witness' mere statement as to his subjective intention. Thus, whether a partnership or joint venture exists depends on whether the parties intended to, and did in fact, join together for the present conduct of an undertaking or enterprise. Commissioner v. Culbertson, supra.
In Luna v. Commissioner, 42 T.C. 1067 (1964), *368 the Tax Court applied these principles. The Tax Court articulated particular elements, none of which is conclusive, which tend to indicate whether the parties did or did not intend to form a partnership. These elements or factors include: The agreement of the parties and their conduct in executing its terms; the contributions, if any which each party has made to the venture; * * * whether each party * * * shar(ed) a mutual proprietary interest in the net profits and [had] an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; * * * whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; * * * and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. [42 T.C. at 1077-1078.] Here the testimony of petitioner and Wolser as to their intention vel non to form a partnership/joint venture is in direct conflict. On the whole, we found Wolser's testimony more credible. Moreover, Wolser's testimony *369 that there was simply an arrangement for performance of legal services on a contingent-fee basis, not a partnership or joint venture, is more consistent with the objective evidence in the record and is supported by the record as a whole. We have given weight to several factors enumerated in Luna v. Commissioner, supra, in reaching our conclusion that no partnership or joint venture existed in regard to the Dynetics stock. [11]
First, the record clearly shows that the arrangement contemplated by Wolser and petitioner in regard to the Dynetics stock was not burdened with any obligation to contribute any capital or to share losses from the disposition of *370 their respective interests in Dynetics Corporation. Petitioner alludes to the contributions by each individual to the "venture," suggesting petitioner contributed $ 32,500 to Wolser as his contribution to the venture. Wolser and petitioner, however, agreed the $ 32,500 payment to Wolser would be treated as a loan if Wolser were able to sell his Dynetics stock to Cooley, or as a sale of Dynetics stock to petitioner if the sale to Cooley did not occur. In other words, Wolser would repay the $ 32,500 to petitioner, either in cash (repayment of loan) or by stock (purchase price of stock). Clearly, the $ 32,500 served as a loan from petitioner to Wolser which would be repaid once Wolser sold his Dynetics stock to Cooley; in the event the Dynetics Corporation stock arrangement with Cooley failed, then petitioner in effect would buy some of Wolser's stock for $ 32,500. In either event, the $ 32,500 did not serve, as petitioner claims, as a capital contribution to a joint venture. Second, in regard specifically to Wolser's Dynetics interests, Wolser held exclusive title and rights to his Dynetics stock, Dynetics debenture, and employment contract. Petitioner did not share in the proceeds *371 from the sale of Wolser's Dynetics stock, the Dynetics debenture, or the settlement of Wolser's employment contract with Dynetics. Petitioner had no proprietary interest in the profits or the losses from the sale of Wolser's various Dynetics interests. Instead, petitioner was paid a fee for his legal services. Third, no Federal partnership returns were ever filed for the purported joint venture. More importantly, Wolser and petitioner never held themselves out to their business associates or to the public as partners or as joint venturers in regard to their respective interests in Dynetics Corporation. It seems clear that petitioner devised the notion of a joint venture only as an afterthought. These various factors indicate that no partnership or joint venture existed. Luna v. Commissioner, supra, 42 T.C. at 1078. Under these circumstances, we are satisfied that the requisite intent to form a partnership or joint venture was lacking. The unsigned and undated handwritten memorandum prepared by petitioner, according to petitioner, is evidence of their intent to enter into a partnership/joint venture agreement. While the Court received the document in *372 evidence, it has little or no probative value. On the other hand, petitioner's two letters of July 30, 1973 show the true relationship of attorney-client. In one petitioner asserted an attorney's lien on the stock belonging to Wolser which petitioner had taken from Wolser's office. In the other petitioner further stated that petitioner had worked for two years "to solve your [Wolser's] problems, first with Dynetics and then with Video and Mr. Cascio." The arrangement between petitioner and Wolser was for the payment for services in the form of a percentage of the proceeds from the sale of Wolser's stock. Applying the various factors articulated in Commissioner v. Culbertson, supra, and Luna v. Commissioner, supra, we hold that, under the particular facts and circumstances of this case, no partnership or joint venture was created between petitioner and Wolser in regard to their respective interests in Dynetics Corporation. Rather, under the oral agreement contemplated by them, petitioner acted on behalf of Wolser as his legal representative and was to receive for his legal services contingent compensation measured by a percentage of *373 the proceeds from Wolser's sale of stock, Dynetics and/or Video Systems stock. See n.6, supra. Merely providing compensation to be measured by reference to the proceeds of stock sales does not by alchemy convert the employment relationship into a partnership or joint venture for Federal tax purposes. Estate of Smith v. Commissioner, supra; Pounds v. United States, 372 F.2d 342 (5th Cir. 1967) Therefore, we conclude that the record does not establish that petitioner and Wolser intended to, or did in fact, "join together" in the formation of a partnership or joint venture. The facts show instead that petitioner rendered legal services for which he was compensated; thus, petitioner must report the $ 109,568 he received during 1972 as legal fees. Having decided that the relationship that existed between petitioner and Wolser did not constitute a partnership or a joint venture for Federal tax purposes, and that petitioner received instead fees for the performance of legal services, we conclude that such legal fees are taxable as ordinary income. Section 61(a) states that "gross income means all income from whatever source derived, including *374 (but not limited to) * * * (1) Compensation for services, including fees, commissions, and similar items * * *." That should end the matter. However, petitioner seems to make an argument, apparently apart from his partnership/joint venture argument that we have rejected, that he is somehow still entitled to capital gains treatment. The ordinary income character of compensation for legal services cannot be magically transformed into capital gains. Pounds v. United States, supra; Estate of Smith v. Commissioner, supra. Even the value of an interest in partnership capital that one receives as compensation for services constitutes ordinary income under section 61. Sec. 1.721-1(b)(1), Income Tax Regs. In Pounds v. United States, supra, the taxpayer had only an expectancy to share in anticipated net profits and from a future sale "if and when they developed." This is not a capital asset. The Fifth Circuit refused to treat the gain on the disposition of the contract rights as capital gains, even though the values of the contract rights were tied to the value of a capital asset. That was because the taxpayer had received those *375 contract rights as compensation for services. Compensation for services rendered clearly constitutes ordinary income under section 61(a). Pounds v. United States, supra; Estate of Smith v. Commissioner, supra; Gordon v. Commissioner, 29 T.C. 510, 514 (1957), affd. 262 F.2d 413 (5th Cir. 1958); Farr v. Commissioner, 11 T.C. 552, 560 (1948), affd. sub nom. Sloane v. Commissioner, 188 F.2d 254, 258 (6th Cir. 1951). The situation before us involves an oral employment contract under which petitioner was hired by Wolser to be Wolser's attorney and to assist him in various legal matters. Petitioner met with Frank Cooley, the director of the Dynetics Corporation, to arrange the purchase by Cooley of both petitioner's and Wolser's Dynetics Corporation stock. Petitioner also attempted to negotiate a second agreement with Frank Cooley for the sale of Wolser's Dynetics stock, after the first agreement was more or less rescinded by Cooley. In addition, petitioner persuaded the Continental Bank not to foreclose on Wolser's Dynetics stock. Finally, petitioner obtained a settlement *376 agreement in regard to Wolser's employment contract and arranged for the payment by Dynetics of Wolser's corporate debenture in the amount of $ 65,000. Each of these activities was the performance of legal services for Wolser. After Wolser's Dynetics interests had been disposed of, petitioner continued to render legal services in regard to Wolser's Video Systems stock. The payment of $ 109,568 in legal fees fails to qualify for capital gains treatment because there was neither a "capital asset" nor a "sale or exchange" as required in section 1221. A taxpayer does not bring himself within the capital gains provision merely by the simple syllogism that a contract normally constitutes "property," that the taxpayer has a contract, and the contract does not fall within a specified exclusion from the definition of a capital asset. Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134-135 (1960) (right to use transportation facilities); Vaaler v. United States, 454 F.2d 1120, 1122 (8th Cir. 1972) (right to render personal services as general agent). If all contracts granting rights could be considered capital assets, without inquiry into *377 the nature of the rights granted, almost all ordinary income from salaries, wages or commissions could be transformed into capital gain. That, of course, is not the law. Furrer v. Commissioner, 566 F.2d 1115, 1117 (9th Cir. 1977), affg. a Memorandum Opinion of this Court. As the Ninth Circuit pointed out in that case, "This attempted transubstantiation of income into capital must fail because the essential element -- the capital asset, tangible or intangible -- is not present." 566 F.2d at 1117. That is true here also. The legal fees paid to petitioner are fully includable in petitioner's 1972 gross income as compensation for services rendered. That amount represents ordinary income to him under section 61(a)(1), not gains from the sale of capital assets. The final issue is whether, under the provisions of section 83, petitioner realized ordinary income in 1974 when he received 22,000 shares of Video Systems stock. Section 83(a) [12] provides that where property is transferred to any person in connection with the performance of services, the fair market value of such property, determined without regard to any restrictions other than a restriction *378 which by its terms will never lapse, in excess of any amount paid for the property shall be included in the gross income of the person who performed such services. This occurs at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture. Sec. 83(a)(1). Under the facts of this case, petitioner cannot and apparently does not argue that the stock here was not compensatory or that the stock was not transferred to him in connection with the performance of services. *379 Respondent asserts that under the terms of section 61 and section 83, petitioner must treat the 22,000 shares of stock in Video Systems Corporation he received from Wolser as ordinary income because they were compensation for legal services, because they were transferred to him in connection with the performance of services, and because the stock was not subject to a substantial risk of forfeiture and was transferable by petitioner in 1974. Petitioner's primary argument is that the value of the stock was not includable in income in 1974 because the shares were nontransferable and subject to a risk of forfeiture during 1974. A transfer of property in connection with the performance of services is subject to section 83, whether the transfer is in respect to past, present, or future services. Sec. 1.83-3(f), Income Tax Regs. Whether property is transferred in connection with the performance of services is essentially a question of fact. Sec. 1.83-3(f), Income Tax Regs.; Centel Communications Co. v. Commissioner,92 T.C. 612 (1989); Bagley v. Commissioner,806 F.2d 169 (8th Cir. 1986), affg. 85 T.C. 663 (1985); Alves v. Commissioner,734 F.2d 478, 481 (9th Cir. 1984), *380 affg. 79 T.C. 864 (1982). In this case petitioner performed legal services for Wolser and was compensated for such services by means of stock. No question is raised as to whether petitioner rendered such services as an employee or as an independent contractor, and it is well established that section 83(a) covers both. Centel Communications Co. v. Commissioner, supra;Cohn v. Commissioner,73 T.C. 443, 446 (1979); secs. 1.83-1(a)(1), 1.83-3(f), and 1.83-7(a), Income Tax Regs. Although petitioner argues otherwise, a review of the facts herein establishes that a dispute arose between Wolser and petitioner concerning the amount of the legal fees owed to petitioner. Petitioner attempted to exercise an attorney's lien against Wolser's Video Corporation stock which petitioner had removed from Wolser's office. Wolser filed suit in the Court of Common Pleas to regain possession of his stock, and the action was settled on January 28, 1974. Under the terms of the settlement stipulation in that litigation, Wolser transferred to petitioner 22,000 shares of Video Systems Corporation stock on February 1, 1974. Under section 83, property is subject *381 to a substantial risk of forfeiture only if the transferee's rights to the full enjoyment of the property are conditioned upon the future performance of substantial services. Sec. 83(c)(1). In this case, the record does not establish that petitioner had any continuing duty to perform substantial services after the transfer of the stock on February 1, 1974. Wolser did not retain petitioner as his attorney after July of 1973, when the rift developed over the amount of petitioner's compensation. After the settlement of the suit in the Court of Common Pleas and after the 22,000 shares were transferred to him, petitioner no longer had any continuing obligation to perform substantial services in order to retain the ownership of the 22,000 shares of the Video Systems stock he had received from Wolser. Any "monitoring" or legal services petitioner performed thereafter were strictly for his own benefit, to protect the additional income from the sale of another 20,000 shares to which he was entitled under the terms of his settlement with Wolser; those "services" had nothing to do with the 22,000 shares that had been transferred to him outright on February 1, 1974. Petitioner, nonetheless, *382 relies upon paragraph 6 of the settlement stipulation for the proposition that he could have forfeited his 22,000 shares of Video Systems Corporation stock to Wolser during 1974 in the event of a breach. Paragraph 6 of the settlement stipulation provided that the parties agreed that a breach of the settlement terms would result in an irreparable injury which would not be compensable through an action at law. The settlement stipulation does not provide for the forfeiture of stock. Instead the parties agreed to injunctive relief and other equitable remedies which would be available in the event of a breach of the settlement terms. Under the law of the Commonwealth of Pennsylvania, rights that are acquired by contract will not ordinarily be enforced by a declaration of forfeiture in equity in the absence, as here, of an express provision therefor. Valley Smokeless Coal Co. v. Manufacturers' Water Co.,302 Pa. 232, 153 A. 327, 329 (1930); Thompson v. Christie,138 Pa. 230, 20 A. 934, 935 (1890). Equity, it has been said, abhors forfeiture and is greatly hesitant to enforce one. Fidelity Fund, Inc. v. DiSanto,347 Pa. Super. 112, 500 A.2d 431, 439 (1985). *383 [13] Neither the stipulation agreement nor the facts of this case suggest even a remote possibility of forfeiture.
According to section 1.83-3(c)(1), Income Tax Regs., a risk of forfeiture depends upon the facts and circumstances of the case. In this case, petitioner's rights in the stock transferred to him were not subject to the performance of any future services nor to forfeiture if any of the terms of the settlement stipulation were violated. Thus, we conclude there was no substantial risk of forfeiture in 1974. Section 83(c)(2) provides that the "rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture." Section 1.83-3(d), Income Tax Regs., also provides that property is transferable, if a person can transfer any interest in the property to any person other than the transferor, "but only if the rights in *384 such property of such transferee are not subject to a substantial risk of forfeiture." Petitioner's rights in the stock were not conditioned upon his future performance of, or refraining from the performance of, any services, so no substantial risk of forfeiture existed on January 28, 1974, the date of settlement of the case in the Court of Common Pleas, or on February 1, 1974, the date of transfer of the shares of stock. Under paragraphs 3 and 7 of the settlement stipulation, petitioner had the right to sell the shares of Video Systems Corporation stock he received without restriction in 1974, even though the stock was not registered with the SEC, Robinson v. Commissioner,82 T.C. 444, 462 (1984), and he could have transferred the stock to someone other than the transferor of the property. While the fact that stock is unregistered may as a practical matter reduce its value, it does not mean it is nontransferable. 82 T.C. at 462-465. Petitioner tries to incorporate by reference the agreement between Wolser and Video Systems Corporation that Wolser would not sell any of the 75,000 shares optioned to Cascio until the balance of the 85,750 block of shares *385 was sold, suggesting that his (petitioner's) settlement stipulation with Wolser somehow made that a restriction on his 22,000 shares. We cannot find that there was any such restriction on his 22,000 shares, and we conclude that any such nebulous "restriction" did not make his shares nontransferable. Therefore, the value of the stock on the date of its receipt was taxable to petitioner as ordinary income in 1974 under the provisions of section 83(a). Under section 83(a), the fair market value of the property is to be determined "without regard to any restriction other than a restriction which by its terms will never lapse." The limitations imposed by the registration requirements of the Federal security laws are not restrictions that will never lapse and are not to be considered in valuing property for the purpose of section 83. Sec. 1.83-3(h), Income Tax Regs.; Bagley v. Commissioner, supra, 85 T.C. at 672, affd. 806 F.2d 169 (8th Cir. 1986); Alves v. Commissioner, supra, 79 T.C. at 878, affd. 734 F.2d 478 (9th Cir. 1984); Pledger v. Commissioner,71 T.C. 618, 628-629 (1979), affd. 641 F.2d 287 (5th Cir. 1981). *386 As Pledger so clearly holds, neither restrictions imposed by contractual agreement nor restrictions imposed by the Federal securities laws are restrictions that by their terms will never lapse. This includes the potential restriction imposed by SEC Rule 144. Sec. 1.83-5(c), Example (3), Income Tax Regs. [14] Petitioner also makes an attenuated argument that restrictions in the agreement between Wolser and the Video Systems Corporation in regard to the sale of the balance of Wolser's 85,750 shares of stock under petitioner's legal opinion letter somehow apply to the 22,000 shares of Video Systems stock here involved. Whatever may be the effect under the securities laws, and assuming that contractual provision even applies to petitioner, any such contractual restrictions cannot be considered restrictions that by their terms will never lapse, within the meaning of section 83. *387 Accordingly, we conclude for purposes of section 83 that the stock was transferable by petitioner and there was no substantial risk of forfeiture of the stock in 1974. Thus, on the facts of this case, section 83(a) applies. Petitioner received, in connection with the performance of services, "property" in the form of 22,000 shares of Video Systems stock at $ 5 per share, having a total fair market value of $ 110,000 in 1974. Therefore, he must include the full $ 110,000 in gross income as ordinary income in 1974 pursuant to section 83 and the regulations thereunder. To reflect the parties' stipulations and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure.↩
2. Wolser also had another loan with Continental Bank for $ 100,000. Wolser had paid $ 25,000 on the $ 100,000, leaving a debt obligation of $ 75,000. In addition, four persons including Wolser, petitioner, Cascio, and Robert Ramsey (an investor) invested in a company called Fiberdyne Corporation. Although there were no written agreements among the four investors, they had guaranteed a $ 48,000 note. Continental Bank presented to each of the four participants one $ 12,000 note, each having agreed to jointly and severally guarantee the loan. However, the bank did limit each participant's interest to one-quarter of the $ 48,000, so each of the principals involved signed a $ 12,000 note with Continental Bank for the loan payment.↩
3. There is another deduction listed of 5,000 shares thus leaving 137,234 total shares of Dynetics stock. There is no explanation in the record as to what these 5,000 shares represented. There is no evidence in the record to establish the accuracy of any of these figures in petitioner's handwritten memorandum, particularly that initial figure of 179,134 shares. ↩
4. Petitioner was going to net $ 65,000 out of his sale of his Dynetics stock. He was to sell 100,000 shares at $ 1.50 per share or $ 150,000, from which he had to pay an $ 85,000 personal liability to Continental Bank (100,000 X $ 1.50 = $ 150,000 - $ 85,000 = $ 65,000). Petitioner was to turn over half of the $ 65,000, $ 32,500, to Wolser.↩
5. A "no-action" letter is similar to a private ruling issued by the Internal Revenue Service. It is a letter written by an attorney for a governmental agency (e.g., SEC) to the effect that, if the facts are as represented in the request for the ruling, the attorney will advise the agency not to take action, because the facts do not warrant prosecution for a securities violation. Black's Law Dictionary (5th ed. 1979).↩
6. While the record is not entirely clear, it appears that some, if not most, of the $ 109,568 Wolser paid to or for the benefit of petitioner in 1972 came from these sales of Video Systems stock. It is not clear whether some of the $ 109,568 also came from the proceeds of the sale of Dynetics stock.↩
7. According to paragraph 5 of the option agreement: The number of shares of Video stock covered by this Option shall be reduced from time to time, as follows: if you do not exercise this Option for at least the following number of shares, cumulatively, by the dates set forth below: A
B
Number of shares,
Date of
Cumulatively
Exercise
18,750
by
January 31, 1973
37,500
by
July 31, 1973
56,250
by
January 31, 1974
then I shall have the right to sell, in the six months following each of the aforesaid exercise dates, solely in brokers transactions as defined in the Act, and this Option shall be reduced accordingly, the lesser of (a) 18,750 shares; or (b) such number of shares as will produce net proceeds to me, after brokers' commissions and transfer taxes, of $ 75,000; or (c) the number of shares in column A, above, less (i) the number of shares for which this Option has been exercised prior to the date of such sale and (ii) the number of shares of Video Stock previously sold by me in the aforesaid brokers' transactions.↩
8. Of those 22,000 shares, 18,750 shares were part of the shares still under option to Cascio, and if Cascio exercised that option before the option as to those particular shares expired on January 31, 1974,↩ then Wolser was to deliver to petitioner 18,750 shares of Video stock restricted from sale to the public, which stock Wolser then held and which was not subject to any option agreement. The remaining 3,250 shares of the 22,000 to be transferred to petitioner, under the terms of the settlement agreement, were shares restricted from sale to the public but as to which Wolser was to have an option to repurchase for $ 13,000 under certain conditions. Thus Cascio's option on the 18,750 shares expired three days after the Court of Common Pleas entered its final decree on January 28, 1974. Cascio never exercised his option as to any part of the 75,000 shares, so Wolser never had need to repurchase the 3,250 shares from petitioner. 9. On February 1, 1974, the common stock of the Video Systems Corporation was selling on the over-the-counter market at $ 5.63 per share. The parties in this case have stipulated that the difference between the over-the-counter price and the fair market value represents a proper blockage discount for the 22,000 shares transferred to petitioner.↩
10. This case was consolidated for trial and tried with the case of Lester E. Wolser v. Commissioner↩, docket No. 4271-81. At the conclusion of the trial, petitioner Wolser settled his case.
11. The only indication of anything that might be considered a joint venture in this case is Capital Concepts, a corporation in which petitioner and Wolser were 50-50 shareholders. However, the investments and activities of Capital Concepts are not involved in this case. What is involved in this case is the Dynetics stock as to which petitioner contends there was a joint venture or partnership arrangement, and the Video Systems stock, which petitioner admits he received for performance of legal services.↩
12. Section 83(a) provides that: (a) General Rule. -- If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of -- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.↩
13. See, Sgarlat v. Griffith,349 Pa. 42, 48, 36 A.2d 330, 333 (1944); Shaw v. New Amsterdam Casualty Co.,310 Pa. 213, 216, 164 A. 916, 917 (1932); Straup v. Times Herald,283 Pa. Super. 58, 68, 423 A.2d 713, 718↩ (1980).
14. The Treasury Department's proposal to Congress for what became section 83 would have taken into account "restrictions imposed by federal securities law or imposed to comply with federal securities law," as well as "restrictions which by their very terms will never lapse." Hearings before the House Committee on Ways and Means on the Subject of Tax Reform, 91st Cong., 1st Sess. 5206 (1969) (Technical Explanation of Treasury Tax Reform Proposals, April 22, 1969). The bill reported out of the House Ways and Means Committee did not include the reference to Federal securities laws (see sec. 321, H.R. 13270, 91st Cong., 1st Sess., 115 Cong. Rec. 21781, 21801 (1969); H. Rept. No. 91-413 (1969), 1969-3 C.B. 200↩, 254-256, and no such provision was included in the legislation that was ultimately enacted.